**OLIN CORPORATION, Plaintiff–Appellant,**

v.

**YEARGIN INCORPORATED, Defendant–Appellee.**

No. 97–5606.

United States Court of Appeals, Sixth Circuit.

Argued April 28, 1998.

Decided June 9, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 13, 1998.

Gregory M. Leitner (argued and briefed), Timothy L. Mickel (briefed), Leitner, Williams, Dooley & Napolitan, Chattanooga, TN, for Plaintiff–Appellant.

William G. Colvin, Schumaker & Thompson, Chattanooga, TN, Edmund M. Kneisel (argued), Caroline W. Spangenberg (briefed), Kilpatrick & Stockton, Atlanta, GA, for Defendant–Appellee.

Before: KENNEDY, CONTIE, and MOORE, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which MOORE, J., joined. CONTIE, J. (pp. 409–410), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

KENNEDY, Circuit Judge.

Plaintiff, Olin Corporation, appeals from the District Court's order granting partial summary judgment on behalf of the defendant, Yeargin Incorporated, in this action seeking indemnity and contribution for expenses and damages incurred by Olin Corporation following the exposure of Yeargin Incorporated employees to mercury, a hazardous substance. For the reasons set forth below, we **AFFIRM**, in part, and **REVERSE**, in part, the judgment of the District Court.

## I.

Olin Corporation ("Olin") owns and operates a facility in Charleston, Tennessee which produces chlorine utilizing the mercury-cell electrochemical process. On July 27, 1988, Olin contracted with Yeargin Corporation ("Yeargin") to conduct certain on-site construction and maintenance services. Among the projects to be completed by Yeargin on August 22–23, 1988, was the replacement of a dilute caustic header pipe. During the replacement of the pipe on August 22, an undetermined amount of caustic soda and toxic mercury spilled onto the floor and onto the clothes and skin of the Yeargin employees when they applied an acetylene cutting torch to the header pipe. In addition, as a result of the heat of the torch and surrounding atmosphere, a mercury vapor developed which was inhaled by Yeargin employees.[1] Upon leaving the premises on August 22, the Yeargin employees who were exposed to the mercury did not clean or decontaminate their bodies, clothes, tools or equipment. The workers therefore contaminated their motor vehicles and their homes and exposed their spouses to the mercury.

As a result of their exposure to mercury, the Yeargin employees and their spouses filed several lawsuits against Olin seeking compensatory and punitive damages in the United States District Court for the Eastern District of Tennessee. The suits were consolidated and will be collectively referred to as the "*Rayburn* cases." The *Rayburn* plaintiffs alleged they became physically ill due to their exposure to mercury and suffered such ailments as severe headaches, dizziness, nausea, cramps, urinary tract problems, pain in body joints, and memory loss; they sought recovery under such theories as

negligence, assault and battery, strict liability, trespass and nuisance to real property, and loss of consortium. The *Rayburn* plaintiffs also alleged that, once they began to show symptoms of mercury poisoning, Olin intentionally mislead the Yeargin employees into believing they suffered merely from the flu. According to the *Rayburn* plaintiffs, Olin further attempted to conceal its misconduct by falsely reporting to them that testing of their homes revealed they were free from mercury toxins.[2] To recover for Olin's alleged misrepresentations, the *Rayburn* plaintiffs asserted theories of negligent misrepresentation, fraudulent misrepresentation, intentional infliction of emotional distress, and outrageous conduct.

The District Court entered orders on August 6, 1990, and December 16, 1992, granting partial summary judgment on behalf of Olin. In the August 6 order, the court held that Olin was the statutory employer of the Yeargin construction workers and therefore the plaintiffs' tort claims against Olin were barred by the exclusive remedy provision of the Tennessee Workers' Compensation Act, Tenn.Code Ann. § 50–6–108. In the December 16 order, the court dismissed the plaintiffs' fraudulent misrepresentation claims, which were based on Olin's conduct before and during the August project, because the plaintiffs had not brought forth sufficient probative evidence to support their claims. Once the two orders were entered, three sets of claims remained: (1) claims by the Yeargin employees and their wives for trespass and nuisance to real property; (2) claims of fraudulent misrepresentation concerning Olin's conduct subsequent to the completion of the project; and (3) claims by the spouses for personal injuries they suffered as a result

---

**1.** The employees were not wearing respirators.

**2.** The plaintiffs also alleged that Olin engaged in fraudulent conduct before and during the project. In these claims, the plaintiffs generally alleged Olin was aware that, if acetylene and propane torches were used to cut the mercury contaminate pipes, Yeargin workers would have to wear special air line respirators to prevent inhalation of mercury vapor. In light of this knowledge, plaintiffs alleged Olin made three fraudulent misrepresentations to Yeargin workers. First, the hot work permit issued by an Olin

employee stated that respirators were not necessary. Second, the line breaking permit prepared by an Olin employee stated that a hot work permit was necessary but that breathing air was not required. Lastly, plaintiffs alleged that Olin's safety and supervisory employees, who were present when the pipes were cut, remained silent and conducted themselves in a manner that fraudulently induced the Yeargin workers into falsely believing the environmental conditions were safe for work without respirators and protective suits.

of their exposure to mercury in their homes. Prior to trial, Olin settled all of these claims.

In addition to the sum paid as a result of the settlement with the *Rayburn* plaintiffs, Olin incurred costs in relation to three other legal matters. First, Olin paid various fines, attorney's fees and expenses following the resolution of a complaint filed by the Commissioner of the Tennessee Department of Labor with the State of Tennessee Occupational Safety and Health Review Commission alleging violations of the Occupational Safety and Health Act, Tenn.Code. Ann. § 50–3–101 *et seq.* Second, Olin settled a claim with the United States Government in the amount of $1,000,000 following the government's institution of a suit against Olin alleging violations of the Clean Air Act, 42 U.S.C. §§ 7401–7479, and the National Emission Standards for Hazardous Air Pollutants, 40 C.F.R. Part 61, Subparts A and E. Lastly, Olin incurred additional attorney's fees, fines, civil penalties and costs relating to an administrative order entered by the Environmental Protection Agency requiring Olin to reimburse government costs and to clean-up contaminated areas as a result of its violations of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9615.

To recover the costs it incurred, Olin filed the instant action against Yeargin seeking indemnity under its contract with Yeargin, contribution under CERCLA, 42 U.S.C. §§ 9607(e) and 9613(f), and contribution under the Tennessee Uniform Contribution Among Tortfeasors Act, Tenn.Code Ann. §§ 29–11–101.[3] On May 28, 1993, Yeargin filed a motion for summary judgment and on March 14, 1994, Olin filed a motion seeking partial summary judgment on the ground that their contract required Yeargin to indemnify Olin for all costs it incurred in relation to the construction project so long as Yeargin was at least negligent in part and its negligence contributed to the damages caused by the mercury spill. On September 26, 1995, the District Court entered an order which granted in part and denied in part Yeargin's motion for summary judgment and denied Olin's motion for partial summary judgment. The court dismissed Olin's contractual indemnity claim seeking reimbursement for the amount paid in settlement with the *Rayburn* plaintiffs and for its CERCLA and Occupational Safety and Health Act costs. The court also dismissed Olin's claim for contribution under the Tennessee Uniform Contribution Among Tortfeasors Act, Tenn.Code Ann. §§ 29–11–101, and one of its claims for contribution under CERCLA; the court dismissed the claim under CERCLA seeking reimbursement for the Yeargin employees' transport of mercury to their homes. Regarding Olin's second theory for reimbursement under CERCLA, the court denied Yeargin's motion for summary judgment on Olin's claim that Yeargin was a transporter pursuant to CERCLA when its employees moved the header pipe from the cell room where it was removed to another location in Olin's plant. The court also denied Yeargin's motion for summary judgment on Olin's breach of contract claim.[4] The court's rulings thus left two claims for adjudication.

Thereafter, Olin filed a motion for interlocutory appeal and a motion to stay the proceedings. On the same date, Olin filed a motion to reconsider and a motion to certify several issues to the Tennessee Supreme Court. In the alternative, Olin sought dismissal of its remaining claims without prejudice in order to file an appeal as of right. In a detailed opinion, the District Court, on February 11, 1997, denied all of Olin's motions. In order to pursue immediate appellate review, Olin voluntarily dismissed with prejudice the claims that remained viable following the District Court's rulings. Olin is now before this Court seeking reversal of the District Court's order granting partial summary judgment to Yeargin.

---

3. Olin also included a count for breach of contract alleging that it suffered damages as a result of Yeargin's failure to comply with certain federal and state regulations.

4. In response to the parties' joint motion for clarification, the District Court, on November 11, 1995, issued a ruling stating that, in litigating its remaining breach of contract claim, Olin could not circumvent the court's interpretation of the indemnity contract and recover damages from Yeargin for the money Olin paid in settlement to the *Rayburn* plaintiffs.

## II.

Our standard of review of a grant of summary judgment is *de novo;* we use the same test used by the district court. *See Brooks v. American Broadcasting Cos.,* 932 F.2d 495, 500 (6th Cir.1991). We view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is proper if the evidence " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *See* Fed. R.Civ.P. 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988)(quoting Fed.R.Civ.P. 56(c)).

## III.

### A. Contractual Indemnity

#### 1. Indemnity for Olin's Negligence

Olin's contract with Yeargin contains an indemnification clause upon which Olin relies to recover from Yeargin the costs it incurred in connection with the suit brought by the *Rayburn* plaintiffs following the mercury spill. Article XXII of the contract reads as follows:

(a) Contractor agrees to protect, indemnify and hold Owner harmless from any and all loss, damage, liability, claims, demands, costs, or suits of any nature whatsoever asserted by employees of Contractor or any third persons (including employees of Owner) for property damage, personal injury or death, or otherwise in each case arising out of, in connection with or incidental to Work performed under this Contract. This indemnity shall include, *without limitation,* costs, expenses, and attorneys' fees occasioned by said loss, damage, liability, claims, demands or suits, as well as the full amount of any judgment rendered or compromise settlement made, plus court costs and interest.

(b) This indemnity shall apply *to the extent that* said loss, damage, liability, claims,

demands, costs, or suits are occasioned, brought about or caused, *in whole or in part,* by negligence of Contractor, its agent, directors, officers, employees or servants and regardless of whether such negligence be active or passive, primary or secondary.

J.A. 236–37 (emphasis added). While both parties agree that subsection (a) requires Yeargin to indemnify Olin for all loss, damage, liability, claims, demands, costs, or suits of any nature whatsoever arising out of, in connection with or incidental to the work performed under the contract, Olin and Yeargin differ in the manner they construe the wording of subsection (b). Olin contends that subsection (b), read in combination with the "without limitation" language of the last sentence of subsection (a), conveys the parties' intention that Yeargin would bear the costs of all losses even where the parties' concurrent negligence caused the injury. In contrast, Yeargin contends that the phrase "to the extent" in subsection (b) limits the scope of Yeargin's indemnity obligation. Olin, Yeargin argues, is entitled to indemnification only as to those costs incurred as a result of Yeargin's fault. Olin counters that the phrase "to the extent," read in conjunction with the "without limitation" language of subsection (a) and the phrase "in whole or in part" of subsection (b), simply limits the application of the indemnity agreement to those instances where Yeargin was at least concurrently negligent. In other words, Olin argues that the indemnity agreement requires Yeargin to indemnify Olin even for costs which are attributable to the fault of Olin. The purpose of subsection (b), Olin contends, is only to excuse Yeargin from indemnification in instances where Olin is the sole negligent party. The parties' dispute over the manner in which to interpret the contract language is a question of law which we review *de novo. See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997); *First American Nat'l Bank v. Fidelity & Deposit Co.,* 5 F.3d 982, 984 (6th Cir.1993). Because the contract instructs that it will be interpreted in accordance with the "law of the place of the build-

ing",[5] we look to Tennessee caselaw to assist us in our interpretation of the indemnity agreement.

■ Tennessee law permits a party to be contractually indemnified for its own negligence, *see Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620, 625 (1964)(applying rule from *Buckeye Cotton Oil Co. v. Louisville & N.R. Co.*, 24 F.2d 347, 348 (6th Cir.1928)); however, as we explained in *Amerco Marketing Co. v. Myers*, 494 F.2d 904 (6th Cir.1974), "[u]nder the law of Tennessee an indemnity agreement does not indemnify the indemnitee's own negligence unless it is clear and unambiguous from the language of the contract that this was the intention of the parties." *Id.* at 913 (citing *Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620 (1964) and *Brogdon v. Southern Ry. Co.*, 384 F.2d 220 (6th Cir.1967)); *see also Eades v. Union Ry. Co.*, 396 F.2d 798, 799 (6th Cir.1968). Tennessee recognizes the "near[ ] ... universal rule that there can be no recovery where there was concurrent negligence of both indemnitor and indemnitee unless the indemnity contract provides for indemnification in such case by 'clear and unequivocal terms.'" *Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620, 626 (1964); *see also Kellogg Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 473 (Tenn. 1973); *Elliott Crane Serv. Inc. v. H.G. Hill Stores, Inc.*, 840 S.W.2d 376, 380 (Tenn.Ct. App.1992); *Summers Hardware and Supply Co. v. Steele*, 794 S.W.2d 358, 361 (Tenn.Ct. App.1990). Based on this standard, we cannot ascribe to the indemnity agreement the meaning Olin proposes unless subsections (a) and (b) contain clear and unequivocal language supporting Olin's interpretation.

■ The District Court concluded that, under these strict rules of contract construction, Yeargin and Olin's contract did not clearly and unequivocally express an intent to indemnify Olin for its own negligence. Quite to the contrary, the court held that the plain language of the indemnity agreement, specifically subsection (b), expressed the parties' agreement that Olin would be entitled to indemnity only "to the extent" Olin incurred losses and damages attributable to Yeargin's fault. While we arrive at the same conclusion as the District Court, we do so in a somewhat different manner.

While we might be persuaded that the contractual language reflects a particular intent of the parties, we are certain that the contractual language less than clearly and unequivocally requires Yeargin to indemnify Olin for Olin's negligence. We, therefore, are prohibited from assigning the meaning Olin suggests. The contract does not contain any express reference to Yeargin's responsibilities in the event Olin's negligence causes losses to Olin.[6] The phrase "to the extent" could be interpreted to impose a percentage limitation on Yeargin's duty to indemnify. Or, "to the extent," read with the phrase "in whole or in part," could be construed to mean that Yeargin's duty is triggered only if it is at least partly at fault. Because the terms are not clear and unequivocal, we are not free to impose upon the parties our opinion as to the proper interpretation of the indemnity agreement. Had the parties intended that Yeargin would indemnify Olin for its own negligence, they could have so provided in a manner sufficient under Tennessee law. "As other courts have noted, if negligent acts of the indemnitee are intended to be included in the coverage, it would only take a few seconds for the attorneys [or parties] to use appropriate express language such as 'including indemnitees' acts of negligence.'" *Wajtasiak v. Morgan County*, 633 S.W.2d 488, 490 (Tenn.Ct.App.1982).

5. *See* Article XXXII, subsection (b) of the Contract. J.A. 240.

6. We thus also decline, as Olin urges, to rely on the insurance clause of the contract which requires Yeargin to maintain, at its expense, comprehensive general liability insurance. *See* Article XVIII of the Contract. Olin contends that Yeargin's duty to obtain insurance suggests Yeargin must indemnify Olin for Olin's negligence. Because this insurance clause, like the indemnification clause, does not contain any express reference to such a duty, we reject Olin's interpretation of this provision. Similarly, although in Exhibit B–II of the Contract, Olin agrees to reimburse Yeargin on a percentage basis for the costs of the workers' compensation, unemployment and general umbrella liability insurance obtained, the clause imposes no duty upon Yeargin to reimburse Olin for Olin's negligence.

Thus, because the language is susceptible to more than one interpretation, it is too equivocal to impose a duty of indemnification upon Yeargin for Olin's negligence.[7]

### 2. *Rayburn* Settlement

█ The question to which we now turn is whether Olin, when it arrived at a settlement with the *Rayburn* plaintiffs, included within the agreement a payment for Yeargin's negligence. If so, Olin would be entitled to indemnification in the amount it paid to cover Yeargin's portion of fault. As aforementioned, Olin settled three claims with the *Rayburn* plaintiffs: (1) claims by the Yeargin employees and their wives for trespass and nuisance to real property; (2) claims of fraudulent misrepresentation concerning Olin's conduct subsequent to the completion of the project; and (3) claims by the spouses for personal injuries they suffered as a result of their exposure to mercury in their homes. The District Court properly concluded that Olin may not be indemnified for its own fraudulent conduct. Regardless of any public policy reason for prohibiting indemnification for intentional conduct, it is clear that the alleged fraudulent conduct was committed by Olin, not Yeargin. Under our resolution of the indemnity agreement, Olin would, therefore, not be entitled to reimbursement on the fraudulent misrepresentation claim.

█ Regarding the remaining two claims, personal injuries of the spouses and trespass/nuisance, based on our interpretation of the indemnity agreement, Olin is not entitled to indemnity for any settlement monies paid to the *Rayburn* plaintiffs to the extent Olin's loss was caused by Olin's concurrent negligence. Instead, Yeargin is contractually obligated to indemnify Olin only in proportion to the percentage of negligence

attributable to Yeargin.[8] Olin submits that its settlement agreement with the *Rayburn* plaintiffs intended to cover Yeargin's negligence and Olin should be accordingly reimbursed for amounts paid to settle the plaintiffs' claims against Yeargin. We agree with the District Court's resolution of this issue and hold that Yeargin does not owe any payments to Olin in connection with the settlement agreement. In addition, at the time Olin negotiated and paid the monetary settlements on the tort claims for property damage and personal injuries to the spouses to the *Rayburn* plaintiffs, Tennessee had abolished joint and several liability and adopted the doctrine of comparative negligence in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). Thus, had the *Rayburn* plaintiffs proceeded to trial on the remaining claims, Olin could have raised Yeargin's fault as an affirmative defense. Alternatively, Olin could have asserted a third-party complaint against Yeargin. In either case, the jury would have apportioned fault to Yeargin at trial because plaintiffs' claims against Yeargin were not barred by workers' compensation. *See Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d 79 (Tenn.1996); *see also Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252 (Tenn. 1997). Instead, Olin reached a settlement with the *Rayburn* plaintiffs prior to trial. Because *McIntyre* adopted comparative negligence before Olin negotiated a settlement, Olin was only responsible for settling its portion of liability, just as a jury at trial would have assigned legal fault only in proportion to the percentage of fault attributable to Olin. Thus, any payment Olin made on behalf of Yeargin would have been voluntary and Yeargin is not obligated to indemnify Olin for a voluntary payment unless the payment was made with Yeargin's knowledge and approval. *See Feld Truck Leasing v.*

---

7. We do not address Olin's assignment of error regarding the District Court's refusal to consider extrinsic evidence in the form of Mr. J.K. Scoggins's affidavit. In order to address this assignment of error, we would have to determine whether the contract language, regarding the extent of Yeargin's duty to indemnify, is ambiguous. If it is ambiguous, we must conclude that the contract does not extend to Olin's negligence under Tennessee caselaw, a conclusion which we have already reached.

8. As explained in the District Court's order denying Olin's motion for reconsideration, Tennessee's abolition of joint and several liability and adoption of comparative negligence in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992), does not dictate that Yeargin must indemnify Olin for its percentage of negligence. Rather, the failure to include unequivocal language in the indemnity agreement imposes the percentage method of indemnification.

*ABC Transnational Transp. Co.,* 681 S.W.2d 554, 555–56 (Tenn.Ct.App.1984). As Yeargin expressed no such knowledge or approval, Olin is not entitled to reimbursement.[9]

## B. Tennessee Uniform Contribution Among Tortfeasors Act

■ As an alternative to its contractual indemnity claim, Olin seeks a statutory contribution remedy for the settlement payments made to the *Rayburn* plaintiffs under the Tennessee Uniform Contribution Among Tortfeasors Act, §§ 29–11–101 to 29–11–106 ("UCATA"). Section 29–11–102(b) of UCATA provides as follows:

> The right of contribution exists only in favor of a tort-feasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tort-feasor is compelled to make contribution beyond his own pro rata share of the entire liability.

Tenn.Code Ann. § 29–11–102(b). The Supreme Court of Tennessee in *Bervoets v. Harde Ralls Pontiac–Olds, Inc.,* 891 S.W.2d 905 (Tenn.1994), explained that while the "pro rata" share approach of the UCATA was irreconcilable with the principle of comparative fault, *McIntyre* did not abolish the remedy of contribution. *Id.* at 907. *Bervoets* clarified that, after *McIntyre*, actions for contribution under the UCATA are permissible but they will be tried "in accordance with the principles of comparative fault." *Id.* at 908.

In accordance with *Bervoets,* Olin seeks to recover the amount it paid in settlement that was in excess of Olin's proportional share of fault. For the same reasons we rejected Olin's claim for reimbursement under the indemnity agreement, Olin's claim for contribution under the UCATA is equally unavailing. The right of contribution under UCATA only "exists in favor of a tort-feasor who has paid more than his [proportional share] of … liability." Tenn.Code Ann. § 29–11–102(b). Under the *McIntyre* decision, applicable at the time of settlement, Olin was only responsible for resolving claims attributable to its own fault. And, as noted by the District Court, there is no record evidence suggesting that the settlement agreement resolved both the plaintiffs' claims against Olin and against Yeargin. As mandated by § 29–11–102(d) of the Tennessee Code:

> A tort-feasor who enters into a settlement with a claimant is not entitled to recover contribution from another tort-feasor whose liability for the injury or wrongful death *is not extinguished by the settlement* nor in respect to any amount paid in a settlement which is in excess of what was reasonable.

Tenn.Code Ann. § 29–11–102(d)(emphasis added). Olin contends that record evidence of a settlement extinguishing the claims against Yeargin is not required because the

---

**9.** We reject Olin's claim that this is a "transitional case" such that the comparative negligence principles of *McIntyre* should not apply. A transitional case is one where the cause of action accrued or where a suit was commenced prior to May 4, 1992, the date of the *McIntyre* decision. *See Owens v. Truckstops of America,* 915 S.W.2d 420, 422 (Tenn.1996). While *McIntyre* instructed that comparative negligence would be applied to all cases tried or retried after May 4, 1992 and "all cases on appeal in which the comparative fault issue has been raised at an appropriate stage in the litigation," *McIntyre,* 833 S.W.2d at 58, Tennessee courts will not apply *McIntyre* to a transitional case if application of comparative negligence will "impose upon any party a substantial injustice." *Ridings,* 914 S.W.2d at 80; *see also Owens,* 915 S.W.2d at 424. We conclude that this is not a transitional case because a cause of action for indemnity arises when the party seeking indemnification first suffers the loss for which he claims indemnity, not when the

underlying tort, upon which the indemnity claim is based, occurs. *See Kane v. Magna Mixer Co.,* 71 F.3d 555, 561 n. 1 (6th Cir.1995), *cert. denied,* 517 U.S. 1220, 116 S.Ct. 1848, 134 L.Ed. 2d 949 (1996); *Security Fire Protection Co. v. City of Ripley,* 608 S.W.2d 874, 877 (Tenn.Ct.App.1980)(" 'statute of limitations for an action for indemnity or contribution does not commence to run until there has been a payment or some loss suffered by a party seeking indemnification or contribution' "); *Stiver Marketing, Inc. v. Performance Bus. Forms, Inc.,* No. 01–A–019108CH00276, 1991 WL 254564, at *4 (Tenn. Ct.App. Dec. 4, 1991)(unpublished disposition)("the right to sue for indemnity … accrues only when payment has been legally made by the indemnitee. Thus, the right does not arise until the indemnitee has actually sustained or suffered loss; either through payment, settlement, or through the injured party's obtaining an enforceable judgment").

statute of limitations had run against any claims the *Rayburn* plaintiffs could have asserted against Yeargin. The plain language of § 29–11–102(d) clearly rebuts Olin's reading of the word "extinguished." The statute requires that the claims be "extinguished *by the settlement.*" Tenn.Code Ann. § 29–11–102(d)(emphasis added). It is thus irrelevant whether the claims were "extinguished" because the statute of limitations expired by the time the plaintiffs elected to settle instead of pursue legal proceedings against Yeargin. *Security Fire Protection Co., Inc. v. City of Ripley,* 608 S.W.2d 874 (Tenn.Ct. App.1980) and *City of Kingsport v. SCM Corp.,* 429 F.Supp. 96 (E.D.Tenn.1976), the two cases upon which Olin relies, do not suggest otherwise. Most notably, these two cases were decided before *McIntyre* and at the time joint and several liability governed in Tennessee. With this in mind, a close reading of these two cases simply reveals that, under the doctrine of joint and several liability, a defendant may seek contribution from a joint tortfeasor even though the plaintiff may not bring an action against the joint tortfeasor because the statute of limitations has expired. *See, e.g., Security Fire Protection Co.,* 608 S.W.2d at 876–77; *City of Kingsport,* 429 F.Supp. at 99. These cases simply do not apply to post-*McIntyre* cases which cannot rely on the doctrine of joint and several liability to recover from a joint tortfeasor. Therefore, the District Court properly dismissed Olin's claim for contribution under the UCATA.

### C. Indemnity for Environmental Costs, Fines and Penalties

■ In addition to seeking reimbursement for the monies paid through settlement with the *Rayburn* plaintiffs, Olin seeks contractual indemnification for the various costs, fines, and penalties it incurred in connection with its violations of federal and state environmental statutes such as CERCLA, the Clean Air Act, the National Emission Standards for Hazardous Air Pollutants, and OSHA. In asserting this claim, Olin relies on the following provision of the indemnity agreement:

(a) Contractor agrees to protect, indemnify and hold Owner harmless from any and all loss, damage, liability, claims, demands, costs, or suits of any nature whatsoever asserted by employees of Contractor or any third persons (including employees of Owner) *for property damage, personal injury or death, or otherwise* in each case arising out of, in connection with or incidental to Work performed under this Contract ...

J.A. 236 (emphasis added). The emphasized language lists the types of losses for which Yeargin is contractually obligated to indemnify Olin and Olin maintains that the word "otherwise" is sufficiently broad to include losses under environmental statutes. The District Court disagreed because, in its view, the language was not sufficiently broad and all inclusive to cover environmental costs. Further, employing *ejusdem generis,* a tool of statutory and contractual construction, the court concluded that "or otherwise" was limited to torts of a similar kind and character to property damage, personal injury, and wrongful death.

■ We begin our resolution of this issue with. the basic principle that parties may shift CERCLA and other environmental liabilities by means of an indemnity agreement. *See* 42 U.S.C. § 9607(e)(1); *Niecko v. Emro Mktg. Co.,* 973 F.2d 1296, 1300–01 (6th Cir.1992). However, whether a particular agreement has shifted such liabilities is a question of state law. *See SmithKline Beecham Corp. v. Rohm and Haas Co.,* 89 F.3d 154, 157 (3rd Cir.1996). Without Tennessee caselaw on point, we turn to a review of decisions of other courts to assist us.

Generally, courts agree that a provision in an indemnity agreement, which contains broad language sufficient to indicate that the parties intended to include all liabilities, will include environmental liabilities as well even without specific reference to an environmental statute such as CERCLA. If an indemnity agreement does not include broad language but rather limits indemnity to specific types of claims, environmental costs will be excluded unless the agreement contains a clear and unambiguous reference to such costs. As noted by one court, this generally accepted rule is derived from the widely accepted principle that indemnity agreements

which purport to indemnify the indemnitee for its own fault are to be strictly construed. *See Purolator Prods. Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 131 (W.D.N.Y.1991). To illustrate, in *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10 (2nd Cir.1993), the United States Court of Appeals for the Second Circuit held that a provision obliging the indemnitor to indemnify the indemnitee for "all liabilities, obligations and indebtedness of Olin related to [its aluminum business] ... as they exist on the Closing Date or arise thereafter" was "sufficiently broad to encompass CERCLA liability." *Id.* at 15–16. Similarly, the Fifth Circuit in *Joslyn Manufacturing Co. v. Koppers Co., Inc.,* 40 F.3d 750 (5th Cir.1995), held that two leases were sufficiently broad so as to require indemnification where the leases read as follows: "Lessee forever shall.. indemnify ... Carrier ... for ... any and all liability, judgment, outlays and expenses" and "[l]essee agrees to indemnity the Railway Company and save it harmless from any and all claims and expenses that may arise or that may be made for death, injury, loss or damage ..." *Id.* at 754. Lastly, in *SmithKline Beecham Corp. v. Rohm and Haas Co.,* 89 F.3d 154 (3rd Cir.1996), the Third Circuit, citing to the Second Circuit's decision in *Olin,* held that an indemnification clause requiring indemnification for "all losses, liabilities, damages or deficiencies "was sufficiently broad to express "the parties' intent to allocate all present and future liabilities" including CERCLA response costs. *Id.* at 159–60; *see also Purolator Prods. Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 131 (W.D.N.Y.1991)("all liabilities and obligations ... relating to or arising out of the Assets" sufficiently broad to include CERCLA indemnification); *Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc.,* 416 Mass. 684, 624 N.E.2d 959, 966 (1993)(a promise to indemnify the indemnitee for "all liability" arising from the indemnitor's services "broad enough to encompass liability under CERCLA").

Utilizing the principle that environmental costs will be read into the indemnity agreement if a reference is expressly made to such costs, the Eighth Circuit in *Lion Oil Co., Inc. v. Tosco Corp.,* 90 F.3d 268 (8th Cir.1996), imposed an indemnification obligation on

Tosco Corporation for environmental cleanup costs because the indemnity agreement specifically provided for costs relating to environmental harms in the following passage:

> Tosco hereby agrees to indemnify and hold harmless [Lion Oil] ... for any and all ... (3) response, remedial and clean-up costs, and (4) other costs or liabilities arising from any sudden or non-sudden harm to the environment or public health resulting from the actions of Tosco ...

*Id.* at 269. The Seventh Circuit in *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321 (7th Cir.1994), similarly read into an agreement an indemnification obligation where the agreement specifically referred to "the maintenance of any action, claim or order concerning pollution or nuisance." *Id.* at 327.

Applying these rules to the indemnification agreement in the instant case, we find that, while there is no specific reference in the agreement to environmental liability, the language is sufficiently broad to encompass the environmental liabilities suffered here. In the contract, Yeargin agrees to "indemnify and hold Owner harmless from *any and all loss, damage, liability, claims, demands, costs, or suits of any nature whatsoever* asserted by employees of Contractor or any third persons (including employees of Owner) *for property damage, personal injury or death, or otherwise."* The various costs, fines, and penalties Olin incurred in connection with its violations of federal and state environmental statutes such as CERCLA, the Clean Air Act, the National Emission Standards for Hazardous Air Pollutants, and OSHA arose because a hazardous substance caused damage to property and personal injuries to the Yeargin workers and their spouses. Thus, we need not resolve the parties' dispute over whether the phrase "or otherwise" incorporates losses incurred under environmental statutes and regulations; because the violations of the environmental statues and regulations caused property damage and personal injuries, we find that the terms "property damage" and "personal injury" extend, as specified by the indemnity provision, to "all loss, damage, liability, claims, demands, costs, or suits of any nature

whatsoever" which occur as a result of the project, including losses resulting from the release of hazardous substances.[10]

## IV.

For the foregoing reasons, the judgment of the District Court is **AFFIRMED** in all respects except for Olin's claim for contractual indemnification for the various fines, costs and penalties it incurred in connection with its violation of various state and federal environmental statutes. The District Court's order granting Yeargin's motion for summary judgment on this claim is **REVERSED** and the action is remanded to the District Court for further proceedings in accordance with this opinion.

CONTIE, Circuit Judge, concurring in part and dissenting in part. I concur in Parts I, II, III–A, and B of the majority opinion. I dissent from Part III–C for the following reasons:

The district court concluded that the language of the contract was not sufficiently broad and all inclusive to cover CERCLA liability or damages for violating federal and state environmental and safety statutes because the plain language used by the parties for the scope of indemnification restricted claims asserted by Yeargin employees to "property damage, personal injury or death, or otherwise." The district court noted that this language is "stereotypical of the kind of language normally used to indemnify against tort claims."

I agree with the district court. Although the phrase "or otherwise" is arguably ambiguous, the doctrine of *ejusdem generis* provides that where general words follow an enumeration of particular kinds or classes of persons or things, the general words refer to the same general nature or class as enumerated in the preceding specific words. *See Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 598 (6th Cir.1995). In the present case,

the indemnity clause contains the particular words "property damage, personal injury, or death," which are torts. Thus, use of the general phrase, "or otherwise," refers to other tort damages or claims for tort injuries similar to those listed before it.

The majority chose to read the indemnification agreement broadly to include CERCLA and other environmental liability because the violation of the environmental and safety statutes *caused* damage to property and personal injury to the Yeargin workers and their spouses. I disagree with this analysis. The indemnity agreement does not agree to indemnify the Owner for all claims or loss *resulting from* or *caused by* property damage, personal injury, or death, but instead for claims *for* property damage, personal injury or death, *i.e.* for tort claims which are different from claims for violations of environmental statutes. Although the violation of the environmental statutes allegedly created property damage and personal injury, such a violation is not a claim for "property damage, personal injury, or death." Because none of Olin's claims arising from statutory liability were of the same class as the tort injuries specifically listed in the indemnification agreement, I believe the district court properly concluded that Yeargin's indemnification obligation did not extend to these types of liabilities. *Beazer East, Inc. v. The Mead Corp.,* 34 F.3d 206 (3rd Cir.1994) (parties failed to express the intent to indemnify for CERCLA liability with requisite clarity), *cert. denied,* 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995). *See also Elf Atochem N. Am. v. United States,* 866 F.Supp. 868 (E.D.Pa.1994); *Mobay Corp. v. Allied–Signal, Inc.,* 761 F.Supp. 345, 358 (D.N.J. 1991).

Moreover, any ambiguity in the contract must be construed against the drafter, and indemnity agreements which purport to indemnify the indemnitee for its own fault must be strictly construed. *See Purolator Products Corp. v. Allied–Signal, Inc.,* 772

---

**10.** In its final argument, Olin submits that the District Court erred in granting summary judgment to Yeargin on its claim for contribution under CERCLA based on Yeargin's liability as a "transporter" pursuant to section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4). Due to our

conclusion that the indemnity agreement includes costs, fines, and penalties associated with environmental liability, we need not address Olin's alternative claim for contribution under CERCLA.

F.Supp. 124, 131 (W.D.N.Y.1991). In the present case, the indemnity agreement significantly does not agree to indemnity for all claims or loss that "arise out of" or "are caused by" personal injury, property damage, or death, which is the way the majority is construing the agreement. I believe that rather than construing the agreement strictly, the majority's interpretation broadens the agreement to impose environmental liability without the requisite clarity. For this reason, I would **AFFIRM** the district court in regard to indemnity for environmental costs, fines, and penalties, and would grant summary judgment to defendant Yeargin.