**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1529**

W. C. ENGLISH, INC.,

Plaintiff - Appellant,

v.

RUMMEL, KLEPPER & KAHL, LLP; CDM SMITH, INC.,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg.  Norman K. Moon, Senior District Judge.  (6:17-cv-00018-NKM-RSB)

Argued:  May 8, 2019                              Decided:  August 14, 2019

Before NIEMEYER and HARRIS, Circuit Judges, and Ellen L. HOLLANDER, United States District Judge for the District of Maryland, sitting by designation.

Vacated and remanded by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Harris and Judge Hollander joined.

**ARGUED:**  Dustin M. Paul, VANDEVENTER BLACK, LLP, Norfolk, Virginia, for Appellant.  Jason N. Smith, SEYFARTH SHAW, LLP, Washington, D.C., for Appellee CDM Smith, Inc.  William D. Bayliss, WILLIAMS MULLEN, Richmond, Virginia, for Appellee Rummel, Klepper & Kahl.  **ON BRIEF:**  James R. Harvey, III, Norfolk, Virginia, Andrew P. Selman, VANDEVENTER BLACK, LLP, Richmond, Virginia, for Appellant.  Anthony J. LaPlaca, SEYFARTH SHAW, LLP, Washington, D.C., for

Appellee CDM Smith, Inc.    Brendan D. O'Toole, Joseph R. Pope, WILLIAMS MULLEN, Richmond, Virginia, for Appellee Rummel, Klepper & Kahl.

_____

NIEMEYER, Circuit Judge:

The Virginia Department of Transportation awarded W.C. English, Inc., the contract to construct a bridge over Interstate 81 near Lexington, Virginia. English in turn retained Rummel, Klepper & Kahl, LLP ("RK&K") to provide "quality assurance" services and CDM Smith, Inc., to provide "quality control" services.

During the construction of the bridge, after much of the bridge's concrete deck had been poured, it was discovered that there was an incorrect depth of concrete over the deck's rebars, which resulted from the rebars' improper placement. Because the deficiency affected the structural capacity of the deck, the Virginia Department of Transportation required English to tear down the bridge and rebuild it. English did so at a cost of over $3.1 million.

English then commenced this diversity action against RK&K and CDM Smith for breach of contract and indemnification. The district court granted summary judgment to RK&K and CDM Smith with a 29-page opinion, which construed contractual provisions and determined some of the facts relating to the conduct of the parties during construction. In doing so, the court construed ambiguous contractual language and resolved factual disputes, which, we conclude, violated the established principles of summary judgment. Accordingly, we vacate the district court's judgment and remand for further proceedings.

I

The contract between the Virginia Department of Transportation ("VDOT") and English for construction of the bridge over Interstate 81 required an 8.5-inch concrete deck reinforced by two separate mats of crisscrossed rebars placed so as to end up with a 1.5-inch concrete cover underneath the mats and a 2.75-inch concrete cover over the top of the mats. To achieve the specified cover dimensions, the mats had to be 2.5 inches apart. English concluded that 2.5-inch spacers, known as "chairs" or "slab runners," needed to be installed between the mats to maintain the 2.5-inch space required between them.

During the course of construction, however, a decision was made by certain English and RK&K personnel to insert 1.75-inch slab runners between the reinforcement mats, which resulted in an incorrect concrete cover and thus the bridge's failure to satisfy VDOT's specifications. Instead of having a 2.75-inch cover, as specified, the cover as constructed was 3.75 inches and more. After VDOT conducted an analysis of the performance of the deck as constructed, it concluded that it could not satisfy the structural capacity required and demanded that English tear down and rebuild the bridge. English did so at a cost of over $3.1 million.

English commenced this action against RK&K and CDM Smith, asserting claims for breach of contract and indemnification arising from the construction deficiency and seeking as damages the cost of reconstructing the bridge. It alleged that RK&K failed to provide "quality assurance" ("QA") services as required by its subcontract and that CDM Smith failed to provide "quality control" ("QC") services as required by its subcontract.

4

The QA and QC functions, while related, were distinct, as provided in VDOT's project requirements:

> Quality Assurance — A process performed independently of the construction contractor . . . for the purpose of determining the conformance of the work by examining the QC data and/or providing objective evidence (independent sampling and testing), to verify the contractor's quality control sampling and testing. The contractor will (organizationally through services independent of production forces) provide the QA inspection normally provided by VDOT . . . .

> Quality Control — Quality control functions performed by the Design-Builder. The quality control function (QC) is to assess and adjust design, production and construction processes so as to control the level of quality being produced in the Project. The purpose of QC is to measure those quality characteristics and to inspect those activities that affect the production at a time when corrective action can be taken to substantially decrease the likelihood that appreciable non-conforming material will be incorporated in the Project.

In their subcontracts with English, RK&K as the QA provider and CDM Smith as the QC provider agreed to follow the "Construction Quality Assurance Plan" and the "Construction Quality Control Plan," both of which were part of the broader "Quality Assurance/Quality Control Plan" for the project.

In particular, the Quality Assurance Plan outlined "three classifications of noncompliant work" and described the responsive procedures for each:

> Level 1 (QC) — Deficient work identified and corrected same day — An example would be reinforcing steel being tied for a bridge footing that does not have the proper cover. The QC inspector points it out to the foreman who corrects it immediately. This issue is noted in the diary by the QC inspector. The QC inspector notes what they found and what the contractor did to correct the issue. The issue is closed.

> Level 2 (QA and QC) — Deficient work identified and corrected at a later date — These are items that a QC inspector identifies in the field, notifies the foreman, the foreman agrees to fix the item, and the QC inspector notes

in their diary what the issue is, the corrective action agreed to and the date it will be completed. The diary is then turned into the QA Office Engineer who transfers the issue to the project Issue Log so it can be tracked to ensure it is fixed. The Issue Log is reviewed by the QA and QC team on a weekly basis to ensure all items are corrected. The QA and QC team performs reinspection of the item prior to removing it [from] the Issue Log. The Issue Log will be turned in weekly to VDOT as well. All issues must be corrected prior to the Design-builder receiving 100% payment for that item.

Level 3 (VDOT, QA and QC) — Deficient work identified and corrected at a later date where a witness or hold point (i.e. VDOT's approval) is required — This is an issue that results [in] a Non-conformance Report (NCR) where the infraction is of a serious nature and requires input from the upper level management from the Design-build team, such as the Design Manager, to resolve it. If a corrective action must take place in the field due to the NCR, a witness or hold point will be initiated to ensure VDOT has the opportunity to review the design-builders performance of the corrective action. When the nonconformance work has been re-inspected by the QC and QA team (and VDOT if required by resolution of the NCR) and the results are satisfactory [an] NCR notice of correction will be issued. All NCR resolutions require VDOT's concurrence. In addition, all NCR's must be corrected prior to the Design-build team receiving 100% payment for that item. An NCR log will be kept and reviewed on a weekly basis to ensure items are being addressed. . . . Where feasible, status tags will be utilized in the field to identify non-conforming work. Authorization for removal can be approved only by originator of NCR or that person's supervisor, and only when demonstrated that nonconforming item meets acceptance criteria or has been reviewed and Accepted for use by the Department Project Manager. Unauthorized removal of nonconformance status tags is prohibited.

Thus, under this framework, Level 1 nonconformities required the CDM Smith inspector to inform the foreman and record the exchange in his project diary; Level 2 nonconformities required the CDM Smith inspector to inform the foreman and an RK&K official; and Level 3 nonconformities required a non-conformance report and upper-level input.

6

In contrast to the Quality Assurance Plan, the Quality Control Plan provided that CDM Smith "will immediately notify the [construction manager] if materials or workmanship do not comply with the specifications" and that "[i]f the issues or deficiencies cannot be resolved, the [CDM Smith] inspector will advise [RK&K] and initiate a Non-conformance report." And elsewhere, the Quality Control Plan stated that CDM Smith was required to "[r]eport any quality deficiencies to the [construction manager], [RK&K], and the [project manager]."

While English's subcontracts with RK&K and CDM Smith were both based on a form provided by English, RK&K added handwritten amendments to its contract. In particular, as relevant here, it amended Sections 11 and 23 of the contract, which governed RK&K's potential liability and indemnification obligations, to provide as follows (with RK&K's amendments that added language noted by italics):

> 11. Indemnity. To the full extent permitted by law, [RK&K] agrees to indemnify and save harmless [English and VDOT], and their servants and employees, from and against any claim, cost, expense, or liability (including attorney's fees), attributable to bodily injury, sickness, disease or death, or to damages or destruction of property (including loss of use thereof), caused by the *negligent* performance of the Work by [RK&K], its subcontractors, or their agents, servants, or employees, provided, however, [RK&K's] duty hereunder shall not arise if such injury, sickness, death, damage, or destruction is caused by the negligence of a party indemnified hereunder, *or by their subcontractors or consultants of any tier.* [RK&K's] obligation hereunder shall not be limited by the provision of any workmen's compensation or similar act.
>
> Should [VDOT] or any other person assert a claim or institute a suit, action or proceeding against [English] involving the manner or sufficiency of the Work, [RK&K] shall indemnify and save harmless [English] and its servants and employees, from and against any liability, loss, damage, or expense arising out of or relat[ing] to such claim, suit, action, or proceeding, *to the extent directly caused by the negligence of subcontractor*

7

*but not to the extent caused by the acts or omissions of [English] or its subcontractors or consultants of any tier.*

\*     \*     \*

23. Damage. *Except if due to [English's] negligence*, [English] shall not be liable or responsible for any loss or damage to the equipment, tools, facilities, or other personal property owned, rented, or used by [RK&K], or anyone employed by [RK&K], in the performance of the Work; and [RK&K] shall maintain such insurance and take such protective action as it deems desirable with respect to such property. *Except if due to [English's] negligence*, [English] shall not be liable or responsible for any loss or damage to the Work, and [RK&K] shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of [English] or any other subcontractor, resulting from the operations of [RK&K], or its subcontractors, agents, servants or employees hereunder. [RK&K] shall take reasonable precautions to protect the Work from loss or damage prior to acceptance by [VDOT].

By contrast, Sections 11 and 23 of CDM Smith's contract contained no such amendments.

Following discovery, the parties filed cross-motions for summary judgment. The district court granted RK&K and CDM Smith's motions and denied English's motion.

In granting summary judgment to RK&K, the district court agreed with RK&K's argument that, even assuming that it had breached its contract, the breach caused no damage because "the terms of the contract absolve[d] RK&K of liability if English was negligent" and that "English has no right to indemnity because . . . the terms of the contract exempt RK&K from liability if English was negligent." The district court read Sections 11 and 23 together, reasoning that even though the provisions employed differing language, they could "be reasonably reconciled." The court's reconciliation of the provisions led "to a reading that [was] similar to the tort concept of contributory

8

negligence: if English was the cause of its own damages it cannot collect." Accordingly, the court held that because English was as a factual matter at least partly responsible for the decision to use the 1.75-inch slab runners, it was barred from recovering any damages from RK&K.

And in granting summary judgment to CDM Smith, the district court held that "CDM Smith is entitled to summary judgment because a reasonable jury would be required to find that it fulfilled its contractual obligations, and English's damages arose out of its sole negligence." In so holding, the court concluded *as a matter of law* (1) that the "Level" framework in the Quality Assurance Plan governed; (2) that the 1.75-inch slab runners presented only a Level 2 nonconformity; and (3) that CDM Smith had fulfilled its contractual duties in addressing such a nonconformity.

From the district court's judgment dated April 13, 2018, English filed this appeal.

II

We review summary judgments *de novo*, "applying the same legal standards as the district court and viewing all facts in the light most favorable to the nonmoving party." *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889 (4th Cir. 2015) (cleaned up). Of course, for RK&K or CDM Smith to be entitled to summary judgment, they must demonstrate that there is "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In this case, the district court granted summary judgment to RK&K and CDM Smith for different reasons. Accordingly, we address the judgment as to each defendant separately.

## A

In granting summary judgment to RK&K, the district court concluded that English's contract with RK&K adopted a scheme "similar to the tort concept of contributory negligence" and that English's negligence thus completely barred its recovery. To reach this conclusion, the court conducted an analysis that "[brought] the most salient parts of each of the [following three] paragraphs together to construe the contract's meaning":

> [11. Indemnity.] To the full extent permitted by law, [RK&K] agrees to indemnify and save harmless [English and VDOT] . . . against any claim, cost, expense, or liability (including attorney's fees), attributable to bodily injury, sickness, disease or death, or to damages or destruction of property (including loss of use thereof), caused by the negligent performance of the Work by [RK&K] . . . provided, however, *[RK&K's] duty hereunder shall not arise if such injury, sickness, death, damage, or destruction is caused by the negligence of a party indemnified hereunder*, or by their subcontractors or consultants of any tier.

> Should [VDOT] or any other person assert a claim or institute a suit, action or proceeding against [English] involving the manner or sufficiency of the Work, [RK&K] shall indemnify and save harmless [English] and its servants and employees, from and against any liability, loss, damage, or expense arising out of or relat[ing] to such claim, suit, action, or proceeding*, to the extent directly caused by the negligence of subcontractor but not to the extent caused by the acts or omissions of [English]* or its subcontractors or consultants of any tier.

> \*   \*   \*

[23. Damage.] . . . *Except if due to [English's] negligence*, [English] shall not be liable or responsible for any loss or damage to the Work, and [RK&K] shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of [English] or any other subcontractor, resulting from the operations of [RK&K], or its subcontractors, agents, servants or employees hereunder.

(Emphasis provided by the district court). Although the court acknowledged that the second paragraph of Section 11 "could possibly be read to anticipate something akin to the tort concept of comparat[ive] negligence," it discarded that interpretation by focusing on Section 11's "use of the word 'directly,'" explaining:

> The use of this word here is best read as "proximately." *See, e.g.*, *Estate of Moses ex rel. Moses v. Sw. Virginia Transit Mgmt. Co.*, 273 Va. 672, 679 (2007) (equating "proximate cause," "direct," and "efficient contributing cause" in the tort context). When read this way, this sentence states that RK&K is liable for damages "to the extent [proximately] caused by the negligence of [RK&K] but not to the extent caused by the acts or omissions of [English]." This reading demonstrates that RK&K agreed to liability when the dual requirements of contributory negligence were satisfied: RK&K would be liable for damages and would indemnify English when RK&K's conduct consisted of "negligence and proximate causation." *Rascher v. Friend*, 279 Va. 370, 375 (2010). But RK&K would not be liable if damages were caused by English, unless it (RK&K) directly or proximately caused the injury.

(Cleaned up).

English contends that the district court's interpretation was erroneous, arguing that Section 11's second paragraph unambiguously "invokes a comparative scheme, not a contributory negligence scheme" and pointing to courts that have interpreted similar "to the extent" language as employing such a comparative scheme. *See Oltmans Constr. v. Bayside Interiors, Inc.*, 10 Cal. App. 5th 355, 364 (2017); *United Rentals Hwy. Techs. v. Wells Cargo*, 289 P.3d 221, 227 (Nev. 2012); *Nusbaum v. City of Kansas City*,

11

100 S.W.3d 101, 107 (Mo. 2003) (en banc) (per curiam); *Greer v. City of Philadelphia*, 795 A.2d 376, 378 (Pa. 2002); *Mautz v. J.P. Patti Co.*, 688 A.2d 1088, 1093 (N.J. Super. 1997).

English argues further that the district court erred in seeking to reconcile and apply a uniform interpretation to the two paragraphs of Section 11 and the one paragraph of Section 23 because each of the three paragraphs "address[es] different issues." In particular, English contends that the second paragraph of Section 11 "is intended to address typical breach-of-contract or breach-of-warranty situations where a problem exists regarding compliance with the contractual obligations" to VDOT and that, because that is the precise scenario in this case, the plain terms of that paragraph should control.

In the alternative, English argues that the relevant language is, at the least, ambiguous and that the district court thus erred in adopting its construction as a matter of law. *See Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co.*, 89 F.3d 243, 247 (5th Cir. 1996); *Ohio Cas. Ins. Co. v. Holcim (US), Inc.*, 548 F.3d 1352, 1357 (11th Cir. 2008) (per curiam); *Olin Corp. v. Yeargin Inc.*, 146 F.3d 398, 404 (6th Cir. 1998); *see also Braegelmann v. Horizon Dev. Co.*, 371 N.W.2d 644, 646 (Minn. Ct. App. 1985).

For its part, RK&K defends the district court's holding, emphasizing that contracts must be read as a whole. *See Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 709 S.E.2d 163, 170 (Va. 2011); *Plunkett v. Plunkett*, 624 S.E.2d 39, 42 (Va. 2006).

While we are not prepared to settle conclusively these interpretation disputes at the summary judgment stage, English's proffered interpretation is, at the very least,

12

reasonable. Indeed, of the two interpretations, English's seems to be more closely aligned with the actual language in the contract. The district court thus erred in rejecting English's interpretation and adopting RK&K's interpretation *as a matter of law*. *See Am. Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965) (noting that a contractual provision that is "susceptible of two reasonable interpretations" is "ambiguous," concluding that the provision at issue was ambiguous, and holding that "since the existence of ambiguous terms creates an issue of fact, the granting of summary judgment for either side [was] improper"); *see also World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 247 (4th Cir. 1992) ("Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence").

RK&K's argument that its interpretation of its indemnification obligation is "consistent with the common law of indemnification," which precludes indemnification for the indemnitee's own negligence, is patently misplaced, as the authority on which RK&K relies concerns *implied* indemnity — a distinct common law doctrine that is not at issue in this case. Indeed, the cases cited by RK&K note that where, as here, there is an express indemnification agreement, the terms of that agreement control. *See Safeway, Inc. v. DPI Midatlantic, Inc.*, 619 S.E.2d 76, 79 (Va. 2005) (distinguishing between the concepts of contribution, implied indemnity, and express indemnity, noting that "an express indemnity agreement reflects *the loss distribution agreed to by the contracting parties*" (emphasis added) (cleaned up)); *Wallenius Bremen G.m.b.H. v. United States*, 409 F.2d 994, 998 (4th Cir. 1969) (describing implied indemnity, noting that "*contract*

13

*aside*, . . . [t]he duty owed by the one sought to be made indemnitor must be 'primary'" (emphasis added) (cleaned up)).

At bottom, while the district court was authorized to construe unambiguous language as a matter of law, it could not resolve genuine disputes regarding the meaning of ambiguous contractual language against the nonmoving party on summary judgment. We therefore vacate the court's grant of summary judgment to RK&K and remand for further proceedings. On remand, it will fall to the factfinder to interpret the relevant aspects of the contract and to determine the effect of any breach by English on RK&K's liability.

B

In granting summary judgment to CDM Smith, the district court held that "a reasonable jury would be required to find that [CDM Smith] fulfilled its contractual obligations and [that] English's damages arose out of its sole negligence," concluding as a matter of law that the slab runners presented only a Level 2 nonconformity and that CDM Smith had satisfied the contractual duties triggered by a Level 2 nonconformity. In so holding, however, the district court improperly settled genuine disputes of material fact against English, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–52 (1986).

To begin, the district court seemed to base its factual conclusion that the slab runners did not present a Level 3 nonconformity solely on its belief that English had conceded as such. But the record does not support such a concession. To the contrary, in

14

its papers filed in the district court, English expressly argued that the slab runners presented a Level 3 nonconformity. The only possibly inconsistent statement occurred during argument at the summary judgment hearing, where counsel for English noted that "if there was a continuing nonconformity, as [RK&K and CDM Smith] now admit they knew occurred, they had a responsibility to not allow it to proceed, they had the responsibility to document it under a Level 2, which this would be." But this was, at most, an argument made in the alternative or an assertion that the slab runners presented *at least* a Level 2 nonconformity. And in any event, as the district court never questioned counsel about whether English was abandoning the position asserted in its papers, this one stray statement was insufficient to constitute a binding judicial concession. Indeed, counsel for CDM Smith acknowledged later *during the same hearing* that English was arguing that the slab runners presented a Level 3 nonconformity.

Whether the construction deficiency presented a Level 3 nonconformity is a factual question that should have been left to the factfinder. The Quality Assurance Plan provides unclear guidance on the subject, stating only that a Level 3 nonconformity involves "deficient work identified and corrected at a later date where a witness or hold point . . . is required" and "results [in] a [n]onconformance Report [when] the infraction is of a serious nature and requires input from the upper-level management . . . to resolve it."

Even if the deficiency was only a Level 2 nonconformity, moreover, it is still unclear what CDM Smith's contractual obligations were in the circumstances presented. There is express language in the Quality Control Plan requiring (1) that CDM Smith

15

"immediately notify the [construction manager] if materials or workmanship do not comply with the specifications"; (2) that "[i]f the issues or deficiencies cannot be resolved, the [CDM Smith] inspector will advise [RK&K] and initiate a Non-conformance report"; and (3) that CDM Smith "[r]eport any quality deficiencies to the [construction manager], [RK&K], and the [project manager]." And it is undisputed that, although CDM Smith did document the construction deficiency and notify an English foreman of the defect, it did not notify the acting construction manager or prepare a non-conformance report. While the district court correctly noted that there is some tension between these Quality Control Plan requirements and the Level framework of the Quality Assurance Plan, the court incorrectly resolved this tension against English, by holding that the Level framework exclusively governed CDM Smith's obligations in this case. *See World-Wide Rights Ltd. P'ship*, 955 F.2d at 245–47. Indeed, English plausibly contends that the Level framework did not govern CDM Smith's obligations at all, as that framework is contained in the *Quality Assurance Plan*, not the Quality Control Plan. In any event, the district court's conclusion was improper at the summary judgment stage.

Beyond these material issues of fact, there remain other disputes regarding what occurred leading up to the final concrete pour for the bridge deck. For example, while English does not dispute that its employees were involved in the decision to use 1.75-inch slab runners, it also contends that it was "directed by CDM Smith inspector [Khairy] Wahba to use the incorrectly sized slab runners," citing deposition testimony by one its foremen. CDM Smith contests this assertion, citing deposition testimony to the contrary

16

by Dylan Frazier. The resolution of disputes of this kind, which relate to negligence of the parties, should also have been left to the factfinder.

Accordingly, we also vacate the district court's grant of summary judgment to CDM Smith and remand for further proceedings. On remand, the factfinder will need to determine what CDM Smith's contractual obligations were under the circumstances, whether CDM Smith satisfied those obligations, and, if CDM Smith failed to meet its obligations, whether and to what extent English is entitled to damages.

\*　　\*　　\*

For the reasons given, we vacate the district court's judgment of April 13, 2018, and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED