

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-1996

# SmithKline Beecham v. Rohm & Haas Co

Precedential or Non-Precedential:

Docket 95-1644

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"SmithKline Beecham v. Rohm & Haas Co" (1996). *1996 Decisions.* Paper 102.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/102

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

SMITHKLINE BEECHAM CORPORATION

v.

ROHM AND HAAS COMPANY

v.

BUCKEYE PIPE LINE COMPANY


Rohm and Haas Company,
                              Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 92-cv-05394)
_____

Argued March 13, 1996

Before:  STAPLETON, SCIRICA and COWEN, Circuit Judges

(Filed July 17, 1996)

JOHN G. HARKINS, JR., ESQUIRE (ARGUED)
Harkins Cunningham
1800 One Commerce Square
2005 Market Street
Philadelphia, Pennsylvania 19103-7042

    Attorney for Appellant


DAVID P. BRUTON, ESQUIRE (ARGUED)
Drinker, Biddle & Reath
Philadelphia National Bank Building
1345 Chestnut Street
Philadelphia, Pennsylvania 19107-3496

    Attorney for Appellee,
    SmithKline Beecham Corporation

---

OPINION OF THE COURT

---

SCIRICA, Circuit Judge.

Plaintiff SmithKline Beecham Corp. ("SKB") brought this declaratory judgment action against the defendant, Rohm and Haas Co. ("R&H"), seeking equitable apportionment of the costs of the clean-up of a contaminated site in Myerstown, Pennsylvania under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. 9601-75 (1988 & Supp. V). Alternatively, SKB sought apportionment of the clean-up costs in accordance with the indemnification provisions of a Purchase Agreement between SKB and R&H.

In 1978, SKB purchased Whitmoyer Laboratories, Inc. ("New Whitmoyer") from R&H under a Purchase Agreement containing certain indemnification provisions. Although R&H and SKB discharged toxic wastes, most of the contamination at the Myerstown site occurred before 1964, when the site was owned by R&H's predecessor ("Old Whitmoyer").

The able and experienced district court held the indemnifications in the Purchase Agreement covered CERCLA liability arising from R&H's ownership of the site. In addition, the court held the doctrine of corporate successor liability by de facto merger brought CERCLA liability arising from the conduct of Old Whitmoyer within the scope of the indemnity clauses of the Purchase Agreement. Consequently, the court allocated all of the clean-up costs for CERCLA liability arising from the conduct of Old Whitmoyer to R&H. R&H brought this appeal.

On appeal, we must determine whether the contractual indemnity provisions of the Purchase Agreement were intended to allocate the environmental liability of Old Whitmoyer, the original owner of the property. Because the Purchase Agreement does not indemnify for CERCLA clean-up costs arising prior to New Whitmoyer's ownership of the Myerstown site, we will reverse the district court. In addition, we believe that under the facts of this case the doctrine of de facto merger cannot be used to modify an indemnity provision drafted by two sophisticated corporations.

I.  Facts

In 1931, Dr. Clarence W. Whitmoyer founded a veterinary feedstock and pharmaceutical business based in Myerstown, Pennsylvania. Incorporated as "Whitmoyer Laboratories, Inc." in 1934, the corporation went public in 1961 ("Old Whitmoyer"). From 1957 to 1964, Old Whitmoyer deposited large quantities of arsenic-laden hazardous waste on the grounds of its Myerstown plant.

In 1964 defendant Rohm and Haas ("R&H") created W-L, Inc., a Delaware corporation, as a wholly owned subsidiary. W-L Inc. purchased the assets of Old Whitmoyer and assumed certain specified balance sheet liabilities in exchange for 50,000 R&H

shares.  Subsequently, Old Whitmoyer changed its name and took steps to dissolve, distributing the R&H stock to its shareholders.  R&H did not know of the contamination at the Myerstown site when its subsidiary purchased the assets of Old Whitmoyer.

W-L Inc., took the name Whitmoyer Laboratories, Inc. ("New Whitmoyer") and continued to run the business of Old Whitmoyer.  New Whitmoyer retained the same CEO as Old Whitmoyer, manufactured the same products under the same name, and sold those products to the same customers.  From 1964 to 1978, New Whitmoyer disposed of additional arsenic-contaminated waste at the Myerstown site.  But New Whitmoyer also undertook efforts to remediate groundwater contamination.  Shortly after acquisition, it supplied bottled water to over twenty neighbors of the plant whose wells had been contaminated with arsenic.  In 1965, New Whitmoyer removed over three million pounds of contaminated wastes and soil skimmings from the existing waste lagoon and stored them in a concrete vault built specially for that purpose.  In addition, New Whitmoyer devised a method to monitor and remove arsenic waste from the groundwater.  Between 1965 and 1971, almost 450,000 pounds of arsenic were removed from the groundwater at the site.

On March 31, 1978, R&H sold its entire animal health products business, including all the stock of New Whitmoyer, to Beecham Inc., a predecessor of the plaintiff SmithKline Beecham Corporation.  Before completing the transaction, R&H notified SKB of the bottled water obligation, showed SKB executives the vault and told them it contained arsenic wastes, and gave them free access to all records at New Whitmoyer.

The Purchase Agreement that governed the sale between SKB and R&H ("1978 Purchase Agreement") contains a broad indemnification clause in which R&H indemnified SKB against "[a]ll material liabilities relating to the conduct of the Business prior to the First Closing Date."  In addition, SKB agreed to indemnify R&H for all losses and liabilities "resulting from the operation of the Business by the Buyer after the First Closing Date."  During SKB's ownership of New Whitmoyer, arsenic-laden waste continued to be released into the environment at the Myerstown site.

Congress enacted CERCLA in 1980.  Two years later, SKB sold New Whitmoyer to Stafford Laboratories, Inc. ("Stafford"). Stafford was a small, undercapitalized company with limited assets and no experience in chemical manufacturing operations. Its president was a felon with two prior convictions for grand theft and embezzlement.  Stafford has since filed for bankruptcy and has not been named as a party in this action.

In 1986, the federal government placed the Myerstown site on the Superfund National Priorities List under  105 of CERCLA.  42 U.S.C.  9605.  Both R&H and SKB were deemed "potentially responsible parties" liable for the contamination at the Myerstown site under CERCLA.  In 1992, the United States settled its CERCLA liability claims against R&H and SKB, resulting in the entry of a consent judgment.  United States v. Rohm and Haas Co., Civ. No. 92-CV-1295 (M.D. Pa.).  Although Old

Whitmoyer caused the majority of the contamination before New Whitmoyer owned the Myerstown site, under the consent decree R&H and SKB are jointly and severally liable for the entire cost of its remediation because of their successive ownership of New Whitmoyer. Estimated clean-up costs total $123 million.

SKB brought this action against the R&H seeking an equitable apportionment of clean-up costs under sections 107(a) and 113(f) of CERCLA, 42 U.S.C. 9607(a) and 9613(f), and enforcement of the indemnity provisions of the 1978 Purchase Agreement.

On cross-motions for summary judgment, the district court held R&H liable for clean-up of wastes dumped during the period when New Whitmoyer was an R&H subsidiary--1964 to 1978-- based on the indemnification provision of the 1978 Purchase Agreement. SmithKline Beecham Corp. v. Rohm and Haas Co., 854 F. Supp. 1201, 1214-15 (E.D. Pa. 1994). But it did not allocate liability for Old Whitmoyer's share of clean-up costs because "at this stage of the proceedings, the court cannot find as a matter of law that [the indemnification] includes conduct of [Old] Whitmoyer Laboratories before R & H purchased it in 1964." Id.at 1214.

The district court took testimony on the indemnification provision in the 1978 Purchase Agreement. It found it unnecessary to determine whether the indemnification expressly included Old Whitmoyer's contamination because it determined New Whitmoyer was liable for Old Whitmoyer's contamination as its corporate successor under Pennsylvania's de facto merger doctrine. It then found the indemnification provision required R&H to indemnify SKB for all New Whitmoyer's pre-closing liabilities, including successor liability for Old Whitmoyer's conduct. SmithKline Beecham Corp. v. Rohm and Haas Co., No. 92-5394 (E.D. Pa. March 17, 1995).

On appeal, R&H argues the indemnity provision of the 1978 Purchase Agreement does not indemnify against environmental liabilities arising under CERCLA. Even if the provision covers CERCLA liability, R&H contends it does not indemnify SKB for Old Whitmoyer's conduct. Finally, R&H claims the district court should not have applied the de facto merger doctrine to make R&H liable for Old Whitmoyer's contamination of the Myerstown site.

We exercise plenary review of the district court's construction of the 1978 Purchase Agreement. Vanguard Telecommunications, Inc. v. Southern New England Tel. Co., 900 F.2d 645, 650 (3d Cir. 1990). We also have plenary review of the district court's interpretation and prediction of Pennsylvania's de facto merger doctrine. Wiley v. State Farm Fire & Casualty Co., 995 F.2d 457, 459 (3d Cir. 1993). We have jurisdiction to review the district court's final judgment under 28 U.S.C. 1291 (1994).

## II.  Discussion
### A.  The Indemnity Covers CERCLA
#### 1.

Under 107(e)(1) of CERCLA, parties may provide indemnifications for environmental response costs. Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar
> agreement or conveyance shall be effective to
> transfer from the owner or operator of any
> vessel or facility or from any person who may
> be liable for a release or threat of release
> under this section, to any other person the
> liability under this section.  Nothing in
> this subsection shall bar any agreement to
> insure, hold harmless, or indemnify a party
> to such agreement for any liability under
> this section.

42 U.S.C.  9607(e)(1).  We have reconciled these apparently inconsistent provisions by interpreting them to mean "agreements to indemnify or hold harmless are enforceable between the parties but not against the government."  Beazer East, Inc. v. Mead Corp., 34 F.3d 206, 211 (3d Cir. 1994) (quoting Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 89 (3d Cir. 1988), cert. denied, 488 U.S. 1029 (1989)), cert. denied, 115 S. Ct. 1696 (1995).  Thus responsible parties can lawfully allocate CERCLA response costs among themselves while remaining jointly and severally liable to the government for the entire clean-up.

We apply state law to determine whether a particular indemnification provision encompasses CERCLA response costs. Hatco Corp. v. W.R. Grace Co., 59 F.3d 400, 405 (3d Cir. 1995); Beazer East, 34 F.3d at 214.  In this case, the 1978 Purchase Agreement provides, and the parties agree, that the indemnity provision "will be governed by and construed in accordance with the laws of the State of New Jersey."  Accordingly we must determine whether, under New Jersey law, the parties intended to indemnify for CERCLA response costs.

Contract interpretation is usually a question of law in New Jersey.  Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 767 F.2d 43, 47 (3d Cir. 1985).  Under New Jersey law, courts should interpret a contract considering "the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction."  Id.

## 2.

In this case the parties could not have expressly included CERCLA liabilities in the indemnification clause because the 1978 Purchase Agreement pre-dates the enactment of CERCLA. But an agreement can require one party to indemnify another against CERCLA response costs even if it was executed before the enactment of CERCLA.  Beazer East, 34 F.2d at 211.  A pre-CERCLA indemnification provision covers response costs if it is either "specific enough to include CERCLA liability or general enough to include any and all environmental liability . . . ."  Id.

The district court held the indemnification provisions in the 1978 Purchase Agreement are broad enough to incorporate CERCLA response costs.  Section 3 of the 1978 Purchase Agreement, entitled "Allocation of Liability/Indemnification," contains three subsections allocating potential liabilities between SKB and R&H.  Subsection 3.1 is entitled "Allocation of Liability." Under this subsection SKB agreed to assume "as of the First Closing Date" certain specified liabilities of R&H pertaining to

the Business.  These liabilities do not include costs for environmental clean-up.  The remaining two subsections provide the parties' indemnifications.  In subsection 3.2(a) R&H agreed to indemnify and hold SKB harmless from:

> (a)  All material liabilities relating to the conduct of the Business prior to the First Closing Date (regardless when the related claim may be asserted), whether accrued, absolute, contingent or otherwise, which are not assumed by the Buyer under Subsection 3.1 . . . .

Subsection 3.3(a) is a reciprocal provision in which SKB indemnifies R&H for:

> (a)  All losses, liabilities, damages or deficiencies to Seller resulting from the operation of the Business by the Buyer after the First Closing Date . . . .

These indemnity provisions divide "all" of the "liabilities" concerning the "operation of the Business" between SKB and R&H.  This sort of broad language in pre-CERCLA contracts has been construed by courts to encompass CERCLA liability.  For example, in Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15-16 (2d Cir. 1993), the Court of Appeals for the Second Circuit held an indemnity provision covering "all liabilities, obligations and indebtedness of [the business] as they exist on the Closing Date or arise thereafter with respect to actions or failures to act occurring prior to the Closing Date" was sufficiently broad to encompass CERCLA liability.

Similarly, the District Court for the Western District of New York held a provision indemnifying for "all liabilities and obligations . . relating to or arising out of the Assets" was expansive enough to include CERCLA liability insofar as such liability related to or arose out of assets transferred. Purolator Products Corp. v. Allied-Signal, Inc., 772 F. Supp. 124, 131 (W.D.N.Y. 1991); see also, American Nat'l Can Co. v. Kerr Glass Mfg. Corp., No. 89-C-0168, 1990 WL 125368, *3 (N.D. Ill. August 22, 1990) (indemnity provision covering "any claim of any kind or nature whatsoever with respect to the business . . . arising out of facts or events occurring prior to the Closing Time" was sufficiently broad to encompass CERCLA liability), reconsidered in part, No. 89-C-0168, 1990 WL 129657 (N.D. Ill. August 30, 1990) (reaffirming this holding).

We believe the language in the 1978 Purchase Agreement indemnity provisions clearly expresses the parties' intent to allocate all present and future liabilities.  Environmental liabilities are among the future unknown liabilities allocated by the parties.  Accordingly we agree with the district court that the indemnity provisions are general enough to evidence the parties intent to include CERCLA response costs.

### B.  Temporal Scope of the Indemnity
#### 1.

Although we have found the 1978 Purchase Agreement indemnity provisions encompass CERCLA response costs, we must still determine whether R&H indemnified SKB for those clean-up

costs attributable to Old Whitmoyer before R&H, through its wholly-owned subsidiary, New Whitmoyer, purchased the assets of that company in 1964. SKB believes it is indemnified against all liabilities that arose prior to its purchase of New Whitmoyer. Accordingly, it argues R&H is responsible for all of Old Whitmoyer's CERCLA response costs. In contrast, R&H claims the indemnity provisions do not include Old Whitmoyer's liabilities and, consequently, those liabilities must be apportioned equitably under CERCLA.

In subsection 3.2(a) R&H indemnified SKB for the liabilities of the Business "prior to the First Closing Date." SKB indemnified R&H for the corresponding liabilities "after the First Closing Date" in subsection 3.3(a). SKB argues these provisions clearly divide all liabilities between the parties according to the date of sale of New Whitmoyer to SKB in 1978. According to SKB, R&H is responsible for all liabilities resulting from activities before the 1978 closing date, including liabilities arising from the conduct of Old Whitmoyer before New Whitmoyer's purchase of the assets of that company in 1964.

R&H argues the dividing line of the date of sale only allocated risks relating to the conduct of the business by New Whitmoyer, not Old Whitmoyer. In subsection 3.2(a), R&H agreed to indemnify SKB only for "material liabilities relating to the conduct of the Business" prior to the date of sale. R&H claims the definition of "Business" does not include Old Whitmoyer and therefore R&H never agreed to indemnify SKB for the conduct of Old Whitmoyer.

The definition of "Business" appears in the first recital to the 1978 Purchase Agreement:

> WHEREAS, Seller manufactures and sells, and conducts research relating to, a line of animal health products . . . and such business is conducted primarily by Whitmoyer Laboratories, Inc., a Delaware corporation ("WL"), WL's "Affiliated Laboratories" and "Barker, Moore, and Mein" divisions and certain foreign subsidiaries and distributors . . . The worldwide operations of such business, together with all the assets relating thereto . . . are referred to herein as "Business".

R&H emphasizes "Business" is defined in this passage as "Whitmoyer Laboratories, Inc., a Delaware Corporation" and affiliates of R&H. This language suggests the term "Business" is limited to New Whitmoyer and other subsidiaries owned by R&H at the time of the 1978 transaction. Since R&H never owned Old Whitmoyer, R&H concludes Old Whitmoyer is not included in the definition of "Business."

SKB contends this clause is "actually more of a description than a 'definition'," serving only to differentiate R&H's animal health products business from other R&H operations not included in the sale. SKB examines the 1978 Purchase Agreement as a whole and argues R&H's proposed definition of "Business" is inconsistent with the general usage of the term

throughout the agreement. Specifically, SKB notes the term "Business" is modified in several locations by the words "by Seller" and "by Buyer." According to SKB, this modification would not be necessary if "Business" meant "business run by New Whitmoyer and certain other R&H subsidiaries."

2.

Regardless of whether "Business" is conceived of as a "definition" or a "description," the term clearly does not encompass Old Whitmoyer. If the parties intended a more general usage of "Business," they could have specifically included Old Whitmoyer in the first recital. Alternatively, the parties could have excluded the defining provision from the 1978 Purchase Agreement altogether. Instead R&H and SKB chose to capitalize the term "Business" and give it a particular, restricted meaning.

We cannot ignore the express language of the contract. See e.g, Communications Workers of America, Local 1087 v. Monmouth County Bd. of Social Servs., 476 A.2d 777, 782 (N.J. 1984) ("The starting point in ascertaining [the parties'] intent is the language of the contract."). The 1978 Purchase Agreement explicitly provides the "Business" is "Whitmoyer Laboratories, Inc. a Delaware corporation ("WL")." Section 9.3 of the 1978 Purchase Agreement states "WL is a corporation duly organized, validly existing and in good standing" under Delaware law, with its certificate of incorporation, as amended, "attached hereto as Exhibit T." That exhibit contains a certificate of incorporation for the corporation formed June 12, 1964, not the predecessor corporation that was incorporated in 1934.

Nowhere in the "definition" or "description" of "Business" is there a suggestion that the meaning of "Business" incorporates the predecessors of, or the prior owners of the assets of New Whitmoyer. SKB contends the use of the term in other sections of the 1978 Purchase Agreement indicates the parties intended a broader meaning than the one they expressly provided. It argues modification of "Business" with the words "by Buyer" creates an oxymoron under R&H's reading. In addition, it claims modification of "Business" with "by Seller" is redundant if "Business" is limited to "the business owned by R&H."

But SKB admits "in the large majority of instances, the Agreement uses the words 'the Business' without express reference to Buyer or Seller." We do not think the explicit definition of "Business" should be disregarded because in a few instances the term was used in an incongruous or redundant manner. Examination of the contract as a whole confirms that the term was used appropriately throughout the document. We will not contravene the parties' apparent "objective intent" on the basis of a few isolated phrases. See Joseph Hilton & Assocs., Inc. v. Evans, 492 A.2d 1062, 1070 (N.J. Super. Ct. App. Div.) ("In construing the contract the court does not focus on an isolated phrase but reads the contract as a whole . . . .") cert. denied, 501 A.2d 977 (N.J. 1985). Reading the contract to avoid ambiguities, we conclude the parties intended "Business" to mean exactly what they said, "Whitmoyer Laboratories, Inc., a Delaware corporation." See United States Bronze Powders, Inc. v. Commerce

& Indus. Ins. Co., 611 A.2d 667, 670 (N.J Super. Ct. Law Div. 1992) ("The court should read [contract] provisions so as to avoid ambiguities, if the plain meaning of the contract permits.").

The first recital of the 1978 Purchase Agreement provides a specific, and restricted, explanation of the term "Business." There is no indication in this explanation, or in any other provision of the contract, that the term "Business" includes Old Whitmoyer. The few minor inconsistencies highlighted by SKB do not justify a rewriting of the contract, particularly since the term is used appropriately throughout. Viewing the contract as a whole, we hold the term "Business" does not include Old Whitmoyer.

### C. De Facto Merger Doctrine

The district court did not decide whether the term "Business" included Old Whitmoyer because it held New Whitmoyer liable for Old Whitmoyer's CERCLA response cost under Pennsylvania's de facto merger doctrine. The court held New Whitmoyer incurred Old Whitmoyer's tort liabilities by virtue of the 1964 asset purchase transaction and New Whitmoyer subsequent conduct of the business. Even under R&H's interpretation of "Business," the court found the indemnity R&H gave for the liabilities of New Whitmoyer included successor liability for the conduct of Old Whitmoyer. Consequently, the court held R&H must indemnify SKB for remediation costs relating to Old Whitmoyer's conduct.

R&H does not dispute that the factors indicative of a de facto merger are present in this case. But it argues the doctrine should not be applied to alter the temporal scope of the indemnification clause. In addition, R&H contends application of successor liability in this case conflicts with policy considerations underlying CERCLA and the de facto merger doctrine.

### 1.

R&H claims the parties should be able to allocate liability through contractual indemnities without the hindrance of judge-made doctrine. Because the parties did not allocate Old Whitmoyer's liabilities in the indemnification provisions, it argues against application of the de facto merger doctrine to hold it responsible for Old Whitmoyer's clean-up costs.

In Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 318 (3d Cir.), cert. denied, 474 U.S. 980 (1985), we held the de facto merger doctrine will not shift environmental liabilities where the parties were in a position to protect themselves through a contractual provision. Hercules, 762 F.2d at 317-18. In Hercules, we found the requirement of an express indemnification is particularly important where, as here, the parties are two sophisticated corporations of roughly equal resources. Id. at 313 (where "corporations of roughly equal resources contract for the sale of an industrial property, and especially where the dispute is over a condition on the land rather than a structure, caveat emptor remains the rule.") (footnote omitted).

In this case, the parties drafted an indemnification

provision that excluded successor liability.  SKB and R&H chose to define "Business" and limit its meaning to New Whitmoyer.  Under these circumstances, we believe it was not appropriate for the district court to apply the de facto merger doctrine to alter the effect of the indemnification provision.  See American Nat'l Can Co. v. Armstrong World Indus., Inc., No. 89-C-0168, 1990 WL 125368 (N.D. Ill. Aug. 22, 1990) (no indemnification because indemnity did not specifically apply to predecessor corporation's liabilities) (applying Pennsylvania law), reconsidered in part, No. 89-C-0168, 1990 WL 129657 (N.D. Ill., August 30, 1990) (addressing de facto merger).

Our holding does not alter the general applicability of corporate successor doctrines in CERCLA contribution claims.  SeeSmith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86 (3d Cir. 1988) (statutory merger) (successor corporation was liable for prior corporation's CERCLA liability in the absence of an indemnification clause), cert. denied, 488 U.S. 1029 (1989).  But where two sophisticated corporations drafted an indemnification provision that excluded the liabilities of a predecessor corporation, we will not use the de facto merger doctrine to circumvent the parties' objective intent.

## 2.

R&H also contends application of the de facto merger doctrine would undermine CERCLA's remedial policies.  Under CERCLA, the cost of remediation is allocated equitably if the parties have not apportioned it by contract.  42 U.S.C. 9613(f)(1).  Of course, the parties here have allocated their responsibilities under the contractual indemnification provisions, which exclude the liabilities of Old Whitmoyer.

In this case, the parties agree each is responsible for the costs of cleaning up their own contamination.  But neither party caused Old Whitmoyer's contamination.  Applying the de facto merger doctrine to require R&H to fund all of the clean-up expenses for Old Whitmoyer's contamination would contravene the express terms of the indemnification provision and incidentally would "frustrate[] Congress' desire to encourage clean-up by any responsible party," id., and force R&H to pay for the entire response cost despite the relative culpability of the parties, see id. (refusing to apply the doctrine of caveat emptor to a CERCLA cost recovery action because the doctrine "bar[s] relief regardless of the degree of culpability of the parties, [and therefore does] not comport with congressional objectives.").  Our refusal to apply the de facto merger doctrine to alter the terms of the indemnity provision leaves both SKB and R&H responsible for their fair share of the clean-up costs of the Myerstown site.  See Beazer East, 34 F.2d at 219 (CERCLA policy favors equitable apportionment of remediation costs).

## 3.

In In re Penn Cent. Sec. Litig., 367 F. Supp. 1158, 1170 (E.D. Pa. 1973), the United States District Court for the Eastern District of Pennsylvania held "the de facto merger doctrine is a judge-made device for avoiding the patent injustice which might befall a party simply because a merger has been called something else."  The doctrine is an equitable rule, a

judicial creation to protect a particular class of plaintiffs from the consequences of a transaction over which they have no control.  The doctrine should conform to the rule's remedial purpose.  See Hercules, 762 F.2d at 312 ("We believe that the de facto merger doctrine is supported by 'social policy considerations' independent of any particular cause of action . . . .")  (citations omitted).

In this case SKB (together with R&H) had control over the assignment of environmental liability through the negotiation of the 1978 Purchase Agreement.  Thus, there is no third party whose interests have been impaired by forces beyond their control.  We decline to apply de facto merger doctrine under these circumstances.  SKB is not within the class of plaintiffs that were intended to benefit from the de facto merger doctrine and use of the doctrine would contravene CERCLA's remedial purpose.

### III.

For these reasons we will reverse the judgment of the district court and remand to determine the parties relative responsibilities for Old Whitmoyer's contamination under CERCLA's equitable apportionment provisions.

SMITHKLINE BEECHAM CORPORATION. V. ROHM AND HAAS COMPANY V. BUCKEYE PIPE LINE COMPANY – NO. 95-1644

STAPLETON, J., Dissenting:

I join Sections I and II-A of the court's opinion.  I would affirm, however, because I conclude that the 1978 purchase agreement unambiguously requires R&H to indemnify SKB for the costs of the cleanup of pre-1964 contamination.

The relevant provisions of the agreement are quite straightforward.  Not surprisingly, the agreement begins by describing in its preamble the business being transferred from the "Seller" to the "Buyer."  That business is described in terms of business "operations" and the assets associated therewith.  The preamble recites that "Seller manufactures and sells, and conducts research and development relating to, a line of animal health products, including veterinary pharmaceuticals, vaccines and diet supplements."  It states that "such business" is currently "conducted primarily by" New Whitmoyer and its affiliates and then lists a number of products, projects, and rights that are included in "such business."  Finally, the preamble stipulates that "[t]he worldwide operations of such business, together with all of the assets relating thereto . . . , are referred to herein as the 'Business'."

In section 3.1 of the agreement, the Buyer assumes specifically described liabilities.  In subsection 3.2, R&H "indemnifies and holds Buyer . . . harmless from and against and in respect of:

(a)  All material liabilities relating to the conduct of the Business prior to the

First Closing Date (regardless when the
related claim may be asserted) whether
accrued, absolute, contingent, or otherwise,
which are not assumed by Buyer pursuant to
Subsection 3.1."

In a reciprocal section, section 3.3, Buyer "indemnifies and
holds RandH and its officers, directors and stockholders harmless
from and against and in respect of:

(a)  All losses, liabilities, damages or
deficiencies to seller resulting from the
operation of the Business by the Buyer after
the First Closing Date . . . ."

As the opinion of the court acknowledges "the language
in the 1978 Purchase Agreement indemnity provisions clearly
expresses the parties' intent to allocate all present and future
liabilities" relating to the business being transferred.  (Maj.
Op. at 11.)  Putting aside the liabilities specifically assumed
in section 3.1, R&H is to bear the ultimate responsibility for
"all material liabilities relating to the conduct of the
Business" prior to the closing date and SKB is to bear the
ultimate responsibility for all liabilities "resulting from the
operation of the Business by the Buyer" after that date.  Insofar
as liabilities arising from the business being transferred before
the closing date are concerned, the responsibility of R&H is not
limited to liabilities arising out of its operation of the
business being transferred.  This is in sharp contrast to the
responsibility of SKB which is limited to liabilities "resulting
from the operation of the Business by Buyer."  (Emphasis
supplied.)

I do not understand R&H to dispute that the preamble of
the agreement describes the business that is being transferred.
Moreover, it acknowledges, as it must, that the business
conducted by Old Whitmoyer from 1957 to 1964 is a part of the
business being transferred.  It necessarily follows, I believe,
that the liabilities at issue here were "material liabilities
relating to the conduct of the Business prior to the" closing
date.

The court fails to focus on the obvious fact that
"Business" as defined or described in the preamble consists of
the operations and assets being transferred by the agreement.
Understandably, those operations and associated assets are
identified in part by reference to the legal entities that were
conducting most of those operations at the time the agreement was
entered.  But as the parties were aware, those operations had
been conducted for a number of years and R&H's responsibilities
under section 3.2 were obviously not intended to be limited to
liabilities arising out of the conduct of those operations at the
time the agreement was entered.  R&H, of course, acknowledges
this.  At the same time, however, it tries to limit its
responsibility to those liabilities arising out of its conduct of
the business between 1964 when it purchased the business and the
closing date in 1978.  Neither the text of section 3.2 nor
anything else in the agreement provides a basis for such a
limitation.  R&H's indemnity responsibilities under the agreement

are simply not limited to liabilities relating to the conduct of the operations being transferred while those operations and assets were under its control.  The parties did not leave pre-1964 liabilities of the business out of their agreement for future resolution by a court.  R&H unequivocally committed itself to indemnify SKB for "all material liabilities relating to the conduct of [the operations and assets being transferred] prior to the . . . Closing Date."  The liabilities at issue here are clearly among those liabilities.