**BUILDING MATERIALS CORPORATION OF AMERICA, d/b/a/ GAF Materials Corporation, Plaintiff,**

v.

**CERTAINTEED CORPORATION and Air Vent, Inc., Defendants.**

**Civ. No. 99–1806 (WGB).**

United States District Court, D. New Jersey.

April 1, 2003.

July 17, 2003.

McCarter & English, LLP, by Andrew T. Berry, Esq., Louis Chiafullo, Esq., Newark, NJ, Kenyon & Kenyon, by John Flock, Esq., Mark A. Hannemann, Esq., New York, NY, for Plaintiff.

Robertson, Freilich, Bruno, & Cohen, LLC, by William W. Robertson, Esq., Jef-

frey A. Cohen, Esq., Newark, NJ, Debevoise & Plimpton, by Bruce P. Keller, Esq., Michael R. Potenza, Esq., Min Lee, Esq., New York, NY, for Defendants.

## OPINION

BASSLER, District Judge.

On this motion to enforce a settlement agreement, the Court must decide whether certain statements posted on a website operated by the defendants constitute a breach of a settlement agreement entered into by the parties in June, 1999. The parties market attic ventilation products, and the agreement prohibits the defendants from making, in words or substance, four specific claims about the plaintiff's attic vent. The plaintiff had sued the defendant alleging false and misleading advertisements in violation of the Lanham Act, 15 U.S.C. § 1125(a), and related New Jersey laws.

The Court held oral argument on March 27, 2003, and the parties agree that this motion can be decided on the basis of that argument and the papers without an evidentiary hearing. For the following reasons, the Court finds that the statements on the Air Vent web-site breach the Settlement Agreement. The plaintiff's motion is granted.

## I. Jurisdiction & Applicable Law

■ The Court has jurisdiction over this matter. The parties incorporated the Settlement Agreement into a Stipulation and Order of Dismissal signed by both parties and the Court and entered pursuant to Federal Rule of Civil Procedure 41(a) on June 22, 1999. The Stipulation and Order expressly provides that the Court retains jurisdiction to enforce the Settlement Agreement. *See In re Phar–Mor, Inc. Sec. Litig.*, 172 F.3d 270, 274 (3d Cir.1999) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994))(explaining

that a provision "retaining jurisdiction" over the settlement agreement makes compliance with the settlement agreement part of the dismissal order and thus a breach of the agreement a violation of the order).

■ The Court applies basic contract principles to its review of settlement agreements. *Flemming ex rel Estate of Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 289 (3d Cir.2002); *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 192 (3d Cir.2000). In this matter, the principles of New Jersey contract law govern the Court's analysis, as expressly provided in the Settlement Agreement. (Hanneman Decl. Ex. 1, Settlement Agreement ¶ 11.) Under New Jersey law, "the polestar of construction of a contract is to discover the intention of the parties." *Jacobs v. Great Pacific Century Corp.*, 104 N.J. 580, 582, 518 A.2d 223, 224 (1986)(per curiam) (citation and quotation omitted); *Bar On the Pier, Inc. v. Bassinder*, 818 A.2d 424, 358 N.J.Super. 473, 818 A.2d 424, 2003 WL 1025027 (N.J.Super.A.D. March 12, 2003) (citing *Jacobs*). The parties agree that it is the objective, not subjective, intent of the parties "manifested in the language of the contract in light of the circumstances surrounding the transaction" that the Court must discern. *Dome Petroleum Ltd. v. Employers Liability Ins. Co. of Wisc.*, 767 F.2d 43, 47 (3d Cir.1985); *SmithKline Beecham Corp. v. Rohm and Haas Co.*, 89 F.3d 154, 159 (3d Cir.1996). Accordingly, evidence of the circumstances surrounding the making of the contract at issue, i.e., extrinsic evidence, is admissible to aid the Court in interpreting the contract language, even when that language is free from ambiguity. *See Halper v. Halper*, 164 F.3d 830, 840 (3d Cir.1999); *see also Biovail Corp. Int'l v. Hoechst AG*, 49 F.Supp.2d 750, 774 (D.N.J.1999) (citing *SmithKline* and *Halper*).

## II. Factual & Procedural Background

### A. Ridge Vents & Attic Ventilation

Plaintiff Building Materials Corporation of America d/b/a GAF Materials Corporation ("GAFMC" or "plaintiff") and defendants CertainTeed Corporation and Air Vent, Inc. ("CertainTeed" or "defendant") market ridge vents, a means of providing attic ventilation. Air Vent is a subsidiary of CertainTeed.

The GAFMC Cobra® ridge vent and the CertainTeed Shingle Vent® II products are intended to function similarly, though they differ in design. Each sits atop the roof of a house, at the peak, covering an open slot cut along the roof. This slot allows warm air to escape from the attic, thereby preventing the temperature inside the attic from becoming significantly warmer than the air outside the attic. (Hanneman Decl., Ex. 7, Sherman Decl. in Support of GAF's Application for Preliminary Injunction ¶¶ 4–7.) Thus, ridge vents function by creating, or at least permitting, airflow through an attic so warm air may escape and cool air may enter. Without proper ventilation, the heat built-up in an attic can cause snow and ice on the roof to melt and then re-freeze, thereby causing water and ice damage to the roof. (*Id.* ¶ 7.) The need for proper attic ventilation is well recognized in the roofing industry. (*Id.* ¶ 9, Exs. A & B.)

CertainTeed's Shingle Vent® II is a rigid plastic cap with external baffles designed to prevent rain and snow from entering the attic and to direct airflow out of the attic. (Keller Decl. ¶ 3, Ex. 2 at 3.) GAFMC's Cobra® ridge vent, on the other hand, is a highly air-permeable, synthetic mesh that is unrolled along the open slot in the roof and left open at the edges to allow warm air out of the attic. (Hanneman Decl., Ex. 7, Sherman Decl. ¶ 16.)

### B. The 1999 Settlement Agreement & Alleged Breach

As noted above and discussed in greater detail below, GAFMC sued CertainTeed in 1999 alleging that the defendant had made false and misleading claims about the Cobra® ridge vent. The purpose of the 1999 Settlement Agreement now at issue, as described in the agreement itself, was "to settle all claims that were or could have been asserted in the Action without any admission of liability...." (Hanneman Decl. Ex.1, Settlement Agreement at 2.) Under the terms of the agreement:

> CertainTeed will not, in any future marketing communication, written or oral, make the following claims, *whether in words or substance:* a) Cobra® ridge vent 'is not a vent at all, but really an air-trapping 'blanket'.' b) Cobra® ridge vent 'allows rain to leak into an attic.' c) Cobra® ridge vent 'simply doesn't work.' d) Cobra® ridge vent was never 'properly tested.'

(*Id.* ¶ 1 (emphasis added).)

GAFMC alleges that CertainTeed breached the Settlement Agreement by posting certain statements on the Air Vent Internet website on a web-page entitled "Performance Testing." According to GAF, the statements on the "Performance Testing" page of the Air Vent website make, in substance, at least two of the four claims prohibited by the Settlement Agreement: that the Cobra® ridge vent "doesn't work" and that it "allows rain to leak into an attic." Specifically, GAF complains of three statements that allegedly make the claim, in substance, that the Cobra® ridge vent does not work:

> 1)"No airflow could be measured at any wind speeds for Roll Vent, Coravent, Cobra Vent or Vent Sure."
>
> 2)"The most significant predictor of ridge vent performance was the external baffle."

3)"Ridge vents without external baffles were unable to create airflow from the attic exhausting through the ridge vent."

(Hanneman Cert. Ex. 2, Performance Testing Web-page, available at www.airvent.com/pro/ventilation/specifications/spec-perftest.html.) GAF identifies two sentences that allegedly make, in substance, the claim that the Cobra® ridge vent allows rain to leak into an attic:

> Furthermore, this reading actually increased as winds increased. Therefore, as winds increase, more air and (potentially) rain and snow can be ingested into the attic.

(*Id.*)

The website is not the only place CertainTeed has published these claims. These statements are identical to statements in a brochure published in 1995 describing the results of a study conducted for CertainTeed by the University of Illinois entitled "Ridge Vent Airflow Performance Tests Conducted at the University of Illinois" (hereinafter "1995 Important Test Results brochure"). (Keller Decl. Ex. 3, 1995 Important Test Results brochure.)

### C. Circumstances Surrounding the Settlement Agreement

The communications between the parties, especially during the months immediately preceding the Settlement Agreement, provide the background necessary for interpreting the language of the agreement to reflect the objective intent of the parties. Toward this end, both parties direct the Court to evidence of the circumstances surrounding the settlement agreement. (*See* Hanneman Cert. in Support of Plaintiff's Motion; Keller Decl. In Support of Defendants' Brief in Opposition to Plaintiff's Motion.)

GAFMC's concern about alleged false advertising by CertainTeed dates to at least 1995, when GAFMC complained about the 1995 Important Test Results brochure. (Keller May 31, 2002 Ltr., Ex. 2:D, GAFMC Ltr. of July 7, 1995 to Air Vent; Keller Decl. Ex. 3, 1995 Important Test Results brochure.) GAFMC took no legal action at the time, but, as noted above, the claims made by CertainTeed in the 1995 Important Test Results Brochure are the same claims now posted on the Air Vent website.

GAFMC again contacted CertainTeed about allegedly false advertising in 1997 and 1998. In February, 1998, CertainTeed began distributing a videotape to roofing and construction professionals nationwide entitled "Attic Ventilation: Blowing Away the Myths;" and in March, 1999, GAFMC sent a letter to CertainTeed enumerating seven categories of allegedly false and misleading statements on that videotape. (Keller Decl., Ex. 6, Transcript of Blowing Away the Myths Video; Ex. 9, GAFMC Ltr. of March 25, 1999 to CertainTeed.) GAFMC noted that it had contacted CertainTeed about misleading advertising in 1995, 1997, and 1998 and demanded that CertainTeed take "immediate corrective action." (*Id.*)

Two days later, CertainTeed responded with its own letter, explaining why it thought the seven categories of statements from the video were "in no way false, misleading, or deceptive." (Keller May 31, 2002 Ltr., Ex. 2:G at 1, CertainTeed Ltr. of March 27, 1999 to GAFMC.) Although CertainTeed offered to make some changes to the video, but not to recall those already in circulation, GAFMC filed its complaint anyway on April 20, 1999.

> In its initial complaint, GAFMC alleged: CertainTeed and Air Vent have disseminated and caused to be disseminated in commerce ... certain advertising or promotional materials, including a video entitled 'Attic Ventilation: Blowing Away the Myths,' that contain false statements of fact and/or statements of

fact that are likely to mislead purchasers and potential purchasers of roofing products . . . .

(Complaint ¶ 10.) On or about May 13, 1999, CertainTeed informed GAFMC that it intended to move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, move pursuant to Rule 12(e) for a more definite statement of the claims. (Keller Decl. Ex. 12, Notice of Motion and Memorandum in Support of Motion.) On May 14, 1999, however, GAFMC informed the defendant by letter that the Court, on GAFMC's application for pendente lite relief (without temporary restraints), had issued an Order to Show Cause that same day. (Keller Decl. Ex. 13, Hanneman Ltr. of May 14, 1999.) Also, and importantly for CertainTeed's arguments on this motion, GAFMC informed CertainTeed that "the additional specificity provided by the enclosed [preliminary injunction] papers" rendered moot the proposed CertainTeed motion. (*Id.*) By the same letter, GAFMC invited CertainTeed to withdraw its motion, which CertainTeed apparently did; the motion was never filed with the Court.

GAFMC's preliminary injunction motion papers focused on the 1998 attic ventilation videotape and alleged that CertainTeed falsely claimed in the videotape that GAFMC's Cobra® ridge vent:

1. Is not a vent at all, but really an air-trapping 'blanket';
2. Allows rain to leak into the attic;
3. Simply doesn't work; and
4. Was never properly tested.

(Hanneman Cert. Ex. 4, Brief in Support of Plaintiff's Application for Preliminary Injunction at 2–3, 7–8.) In response to the plaintiff's application, which was made ex parte, the Court initially issued an Order that CertainTeed show cause why preliminary relief should not be granted, set an expedited discovery schedule, and scheduled a preliminary injunction hearing for June 28, 1999. (Order of May 14, 1999.)

Sometime after the Order issued, however, CertainTeed contacted the Court to object to the expedited schedule. The Court then called a conference for May 25, 1999 to discuss the issue. Before the conference, the parties exchanged letters. On May 17, CertainTeed sent a letter to GAFMC confirming that, as stated in GAFMC's Letter of May 14, the actionable claims asserted by GAFMC were those described in the preliminary injunction papers. (Keller Decl. Ex. 14 at 1.) CertainTeed also offered to stop distributing the video tape and not repeat the four specific statements that were the focus of GAFMC's preliminary injunction motion. On May 18, however, GAFMC sent another letter to CertainTeed asking the defendant to clarify its proposal. (March 27, 2003 Hearing, Ex. D1, Gordon Ltr. of May 18, 1999 to Bruce Keller.) GAFMC stated that if CertainTeed was proposing to stop distributing the videotape and "never again to make, in any future advertising, any of the statements described on pages 7 and 8 of GAFMC's Brief in Support of its Application for Preliminary Injunction, either expressly or by implication, then we have a basis upon which to commence settlement negotiations." (*Id.*)

At the May 25th conference, held on the record, the Court concluded that the expedited schedule it had set was not appropriate and vacated the May 14 Order. (*See* Keller Decl. Ex.1, Transcript of May 25, 1999 Conference.) Two days later, GAFMC filed an amended complaint. Importantly, the amended complaint made a more definite statement of GAFMC's claim:

CertainTeed and Air Vent have disseminated and caused to be disseminated in commerce . . . advertising and promotional materials, *including printed*

*materials and a video* entitled 'Attic Ventilation: Blowing Away the Myths,' that contain false statements of fact and/or statements of fact that are likely to mislead ... The false statements include the following:
(I) GAFMC's Cobra® ridge vent does not work; (ii) GAFMC's Cobra® ridge vent is insufficiently air-permeable; (iii) GAFMC's Cobra® ridge vent is insufficiently weatherproof; (iv) GAFMC's Cobra® ridge vent will not work due to dust accumulation; and (v) GAFMC's Cobra® ridge vent was not properly tested.

(Amended Complaint ¶ 10) (emphasis added). Thus, GAFMC clarified its claims in two ways with the amendment: by listing the alleged false statements, GAFMC made its claim more definite, but by including "printed materials," GAFMC made clear that its claims in the action as a whole, as opposed to the preliminary injunction, included both statements made in the video and other, printed materials.

CertainTeed was aware of this change, for it answered the amended complaint on June 2, 1999, denying the allegations in paragraph 10. (Defendants' Answer to Amended Complaint ¶ 10.) Also, before amending the complaint, Jane A. Gordon, GAFMC's Corporate Counsel, represented to CertainTeed's counsel and the Court at the May 25th conference that the scope of the action as a whole, as opposed to the preliminary injunction motion, included claims beyond the video: "Ms. Gordon: There are a lot of things that we have to explain about in terms of their advertising. It's not simply the four statements, it's a lot of their advertising that's not addressed in the preliminary injunction motion." (Keller Decl. Ex.1 at 8:4–7, Transcript of May 25, 1999 Conference.) CertainTeed's counsel recognized this scope of the action, explaining that CertainTeed had offered not to make the claims complained of in the preliminary

injunction papers "in any way, shape or form." (*Id.* at 9:10–16.)

After GAFMC amended its complaint and clarified its claims, the parties settled the action and signed the stipulation of dismissal, which was entered as the Stipulation and Order on June 22, 1999.

## III. *Whether CertainTeed Breached the Settlement Agreement*

█ CertainTeed contends that the above reviewed course of dealing between the parties shows that GAFMC expressly excluded the statements it now complains of from its 1999 lawsuit and the Settlement Agreement. CertainTeed also argues that, in the statements complained of, it has not made, "in words or substance," any of the four claims about Cobra® ridge vents prohibited by the Settlement Agreement. GAFMC counters that it brought its lawsuit to stop CertainTeed from making the false and misleading claims that it had made in the past, both in print and in the "Myths" videotape, as made clear by the evidence and the amended complaint.

Mindful that, in interpreting the Settlement Agreement, the Court must discern the objective intent of the parties as manifested in the language of the agreement itself, the Court finds that the statements on the Air Vent website violate the Settlement Agreement.

### A. *The 1999 Action and Settlement Agreement Did not Exclude Non-"Testimonial" Claims by CertainTeed*

The agreement states clearly that its purpose is to settle "all *claims* that were or could have been asserted *in the Action.*" (Settlement Agreement at 2 (emphasis added).) CertainTeed argues that GAFMC deliberately chose not to pursue in its action the claims made by CertainTeed in the 1995 Important Test Results brochure and now on the Air Vent website.

CertainTeed labels these claims "empirical" claims because they are derived from the University of Illinois airflow study. Instead, CertainTeed argues, GAFMC restricted the 1999 lawsuit to four specific "testimonial" claims in the videotape. That is, GAFMC limited its action to the claims about Cobra® ridge vents made in the video by contractors based on their actual experience with various ridge vents. The claims that, for example, the Cobra® ridge vent "doesn't work" and "allow rain to leak into an attic" are "testimonial" statements in CertainTeed's view.

According to CertainTeed, because GAFMC based its action only on the "testimonial" claims, the enumeration in the Settlement Agreement of the four specific prohibited claims derived from and quoting the language used by the contractors in the videotape reflects the intent of the parties: only "testimonial" claims, as opposed to "empirical" claims, are prohibited. Therefore, the "empirical" claims from the 1995 brochure now posted on the Internet are not, and never were, prohibited by the Settlement Agreement. The evidence, however, does not support CertainTeed's view that the action was limited to "testimonial" claims and does not support its view that the Settlement Agreement was similarly limited.

CertainTeed's argument relies upon the exchange of letters between the parties on May 14 & 17, 1999 in which GAFMC responded to CertainTeed's motion to dismiss or for a more definite statement. It is true, as CertainTeed points out, that GAFMC represented in its May 14 letter that the preliminary injunction papers included a more definite statement of the actionable claims. It is also true that GAFMC's preliminary injunction papers focused on the four "testimonial" claims from the videotape. By its May 17 letter to GAFMC, CertainTeed confirmed its understanding that GAFMC's preliminary injunction papers, at pages 2–3 and 7–8, set forth the actionable claims.

But the letters of May 14 and 17 that CertainTeed would have be the definitive word on interpreting the scope of the action and Settlement Agreement were not the final framing of the claims in the action. On May 18, 1999, GAFMC sent another letter to CertainTeed in response to the defendant's letter of May 17. In that letter, GAFMC stated explicitly that its action was not limited to the four claims from the videotape that had been the focus of the preliminary injunction motion. In fact, GAF sought more than just CertainTeed's commitment to stop making the claims, in "testimonial" form, from the video:

> If CertainTeed is offering to stop distributing the videotape and never again to make, *in any future advertising,* any of the statements described on pages 7 and 8 of GAFMC's Brief in support of its Application for Preliminary Injunction, *either expressly or by implication,* then we have the basis upon which to commence settlement negotiations.

(March 27, 2003 Hearing, Ex. D1 (emphasis added).) Then, at the May 25 conference, GAFMC corporate counsel Gordon again stated explicitly that the action was not limited to the four statements from the videotape:

> It's not simply the four statements, it's a lot of their advertising that's not addressed in the preliminary injunction motion.

(Keller Decl. Ex.1, Transcript of May 25, 1999 Conference at 8:5–7.) Indeed, at the same conference, and at his first opportunity to speak following Gordon's statement about the scope of the action, CertainTeed's counsel recognized that the action included more than merely the four claims, in haec verba, from the video in "testimonial" form:

There is an unequivocal commitment to stop distributing the video. There is a further commitment, that's why we say in our papers very precisely, *not only do we offer to stop distributing the video, we offered to go further and we offered not to make in any way, shape or form the statements,* the particular cherry-picked statements about which they complain.

(*Id.* at 9:10–16 (emphasis added).)

Finally, on May 27th, GAFMC filed its amended complaint, which CertainTeed ignores in its opposition to GAFMC's motion,[1] clearly alleging that CertainTeed's printed materials and videotape contained the allegedly false and misleading statements enumerated in the amended complaint. Among the false statements alleged were that Cobra® ridge vent "does not work" and that it "is insufficiently weatherproof." (Amended Complaint ¶ 10.) CertainTeed answered the amended complaint.

Thus, the May, 1999 letter exchange, the conference on May 25, 1999, and the amended complaint show that the action was not restricted to a narrow set of "testimonial" statements made by CertainTeed in a single videotape, though the preliminary injunction was. The letters of May 14 and 17 alone simply do not take account of the developments after May 17, 1999. Moreover, CertainTeed answered the amended complaint on June 2, 1999. When it did so, it denied, inter alia, that it had disseminated printed material containing the alleged false statements enumerated in the amended complaint. Whatever defenses might have been available to CertainTeed with respect to the claims it made in the 1995 Important Test Results brochure had it chosen to litigate their

legality, "the Action" included those claims, and thus so did the Settlement Agreement. The objective intent of the parties, manifested in the language of the agreement, was to settle all claims in "the Action," not only the actionable "testimonial" claims from the videotape.

### B. CertainTeed Has Made, in Substance, Claims Prohibited by the 1999 Settlement Agreement

Because the 1999 action included more than just "testimonial" claims, CertainTeed's res judicata and statute of limitations arguments are inapposite. This motion is not a subsequent suit brought to relitigate the same claims settled by the Settlement Agreement or an action to reform the Settlement Agreement, which would be barred by principles of res judicata. *Cf. Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 962 (3d Cir.1991) (holding party barred by doctrine of claim preclusion from bringing action to reform settlement agreement after subject of reform sought held outside the agreement by another court). Rather, the motion is a motion to enforce a contract—the Settlement Agreement—entered into by the parties that ended the prior cause of action. GAFMC now alleges that CertainTeed has breached that contract. By its nature, the issue of whether CertainTeed breached the agreement settling GAF's action against it could not have been litigated in that original action. The remaining issue, then, is whether, the statements on the Air Vent web-site violate paragraphs 1(b) & (c) of the Settlement Agreement.

CertainTeed urges the Court to interpret the language "in words or substance" to mean (1) the same words, (2) the same

---

1. It is simply not true, as CertainTeed's counsel claims in a September 4, 2002 Letter to the Court, that GAFMC "made no mention of the Amended Complaint in its memorandum of law." (Keller Sept. 4, 2002 Ltr. at 2.) GAFMC cited and quoted the amended complaint at page three of its moving brief.

words in a different order or syntax, or (3) synonymous language. In support of this interpretation, CertainTeed cites a decision from the Southern District of New York, applying New York contract law. In that action, the defendant claimed that certain of its advertising statements did not violate its settlement agreement, which included a list of prohibited statements, because the advertising statements "were not the exact statements" included in the settlement agreement. *Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005, 1017 (S.D.N.Y.1994). On the *Mobius* defendant's theory, so long as the statements did not contain the same language, the substance of the statements could be the same.

The court rejected the notion that the statements must be exactly the same to be prohibited under the agreement, noting that although the phrase "equivalent statements" had been discussed by the parties during settlement negotiations and the word "equivalent" left out of the agreement, the deletion of that word from the final agreement did not mean "that the prohibited words may be made if placed in different syntax." *Id.* at 1018. The court also noted that it made sense to leave the word "equivalent" out of the agreement because the word, as defined in the dictionary, "can mean of equal value or equal strength," which concepts are "considerably broader and more ambiguous than the concept of merely being the same in substance." *Mobius*, 880 F.Supp. at 1018.

Latching on to the phrase "in substance," both parties proffer interpretations of the word "substance" based upon the Mobius court's discussion of the word. But reliance on *Mobius* is inappropriate. First, the *Mobius* court was not interpreting the phrase "in substance;" the phrase does not appear to have been included in the settlement agreement at issue. All we know is that the settlement agreement contained a list of proscribed statements, and the defendant tried, unsuccessfully, to re-package the ideas communicated in those prohibited statements to comply with the settlement agreement.

More importantly, because the court was not interpreting the phrase "in substance," it did not define the word "substance." The court actually defined only the word "equivalent." With respect to "substance," the court only suggested that statements may be made to say the same thing "in substance" as other statements by changing the sentence structure or by using synonyms. *Id.* at 1018. CertainTeed urges that these examples define the word. But the objective intent of the parties was not to restrict the meaning of "substance" to synonymous words or sentences.

First, "substance" means "essential nature: essence," or "a fundamental part, quality, or aspect: essential quality or import." *Webster's Third New Int'l Dictionary* (1976). This usual meaning of the word makes eminent sense given the syntax of the sentence. The Settlement Agreement did not prohibit the four statements "in the same or synonymous words;" it prohibited the statements "in words or substance," that is, in words or essential nature. Second, CertainTeed, albeit inadvertently, explains precisely how it made, in substance, the same statements on its web-page as those prohibited by the Settlement Agreement: "Although the subject matter is the same, the concepts are expressed quite differently." (Opp. Brief at 10.) CertainTeed did not say in words that the Cobra ridge vent "simply doesn't work" or "allows rain to leak into the attic," but the statements on the Air Vent website communicate these very concepts, albeit "quite differently" because the website uses "empirical" statements rather than "testimonial" statements. Finally,

the same portions of the record that show the intent of the parties with respect to the scope of the action—the May, 1999 letter exchange, the colloquy at the May 25 conference, and the amended pleadings—show the parties intended to prohibit claims that are in essence the same as the specific claims enumerated in the Settlement Agreement.

Interpreting the agreement using this understanding of "substance," the statements complained of violate the Settlement Agreement. The first prohibited claim at issue is: "Cobra® ridge vent simply doesn't work." (Hanneman Decl. Ex. 1, Settlement Agreement ¶ 1.) Rather than claiming in words that Cobra® ridge vent does not work, CertainTeed does so in substance on the Air Vent website by stating:

1)"No airflow could be measured at any wind speeds for Roll Vent, Coravent, Cobra Vent or Vent Sure."

2)"The most significant predictor of ridge vent performance was the external baffle."

3)"Ridge vents without external baffles were unable to create airflow from the attic exhausting through the ridge vent."

The essence of these statements is that the Cobra® ridge vent does not permit airflow; and if a ridge vent permits no airflow, it does not work. After all, ridge vents are designed to permit attic ventilation while keeping outside contaminants like rain, snow, and insects out. (Hanneman Decl. Ex. 7, Sherman Decl. ¶¶ 10–11.) To ventilate an attic, ridge vents take advantage of the principle that hot air rises, allowing hot air to escape an attic and cool outdoor to replace it. (*Id.* ¶¶ 12–15.) Without "airflow," the ridge vent does not work because it would not ventilate the attic.

The second prohibited claim at issue is: "Cobra® ridge vent allows rain to leak into an attic." The Air Vent website

claims that with a Cobra® ridge vent, "(potentially) rain and snow can be ingested into the attic." This is a fancy way of saying the ridge vent leaks (potentially). "Leak" means "to enter or escape through a hole, crevice, or other opening." *Webster's Third New Int'l Dictionary* (1976). "Ingest" means "to take in for digestion" or just "to take in." *Id.* There is no relevant distinction between saying an attic "ingests" rain and an attic "leaks." Whether one uses "ingest" or "leak," the statements claim that water gets into the attic, and that, in essence, is what CertainTeed agreed not to claim.

The only difference between the claims on the website and those claims enumerated in the Settlement Agreement, therefore, is that the claims now at issue are not "testimonial" but "empirical" claims. But, as already discussed, neither the amended complaint nor the Settlement Agreement made any such distinction and, in substance, the so-called "empirical" claims are the same as the "testimonial" claims. They are merely two means of communicating to potential customers that the Cobra® ridge vent does not work and leaks, one folksy, the other scientific.

If "substance" has any meaning in the Settlement Agreement at all, which it must, then the claims prohibited by the Settlement Agreement and the claims on the Air Vent website are the same in substance. By any objective standard, the agreement reflects what the parties intended to proscribe: the claims enumerated in the agreement and claims that are, in substance, the same as those enumerated claims.

*IV. Conclusion*

For the foregoing reasons, the plaintiff's motion to enforce the Settlement Agreement is granted. The statements on the Air Vent website breach the Settlement

Agreement, and CertainTeed must remove the offending statements to comply with the June, 1999 Stipulation and Order. An appropriate order follows.

### AMENDED ORDER

This matter having come before the Court on the motion of plaintiff BUILDING MATERIALS CORPORATION OF AMERICA, d/b/a/ GAF MATERIALS CORPORATION to enforce the Settlement Agreement; and

The Court having considered the submissions of the parties and having held oral argument on March 27, 2003; and

For the reasons set forth in the Opinion issued April 1, 2003; and

The Court having concluded that the following statements, as used on the Air Vent webpage challenged on this motion, claim in substance that Cobra® ridge vent "simply doesn't work" in violation of Settlement Agreement ¶ 1(c):

1)"No airflow could be measured at any wind speeds for Roll Vent, Coravent, Cobra Vent or Vent Sure."

2)"The most significant predictor of ridge vent performance was the external baffle."

3)"Ridge vents without external baffles were unable to create airflow from the attic exhausting through the ridge vent."; and

The Court also having concluded that the following statement, as used on the Air Vent webpage challenged on this motion, claims in substance that Cobra® ridge vent "allows rain to leak into an attic" in violation of Settlement Agreement ¶ 1(b):

4)"Furthermore, this reading actually increased as winds increased. Therefore, as winds increase, more air and (potentially) rain and snow can be ingested into the attic.";

and

CertainTeed Corporation having subsequently sold Air Vent, Inc. to Gibraltar Steel Corporation; and

Good cause having been shown;

It is ORDERED that plaintiff's motion to enforce the settlement agreement is **granted**; and

IT IS FURTHER ORDERED that GIBRALTAR STEEL CORPORATION, its predecessor in interest CERTAINTEED CORPORATION and AIR VENT, INC., and all others acting in concert with them, shall modify or remove forthwith the statements adjudged violative of the Settlement Agreement so that the statements no longer make any of the four claims proscribed by that Agreement; and

IT IS FURTHER ORDERED that GIBRALTAR STEEL CORPORATION, its predecessor in interest CERTAINTEED CORPORATION and AIR VENT, INC., and all others acting in concert with them, shall not, in future marketing communications, written or oral, make the following claims, whether in words or substance, as the Settlement Agreement requires:

a) Cobra® ridge vent "is not a vent at all, but really an air-trapping 'blanket'."

b) Cobra® ridge vent "allows rain to leak into an attic."

c) Cobra® ridge vent "simply doesn't work."

d) Cobra® ridge vent was never "properly tested."